WARNER LAMBERT COMPANY (AMERICAN CHICLE CO. DIVI-
SION), peticionaria, *v.* TRIBUNAL SUPERIOR DE PUERTO
RICO, SALA DE SAN JUAN, HON. ARMINDO CADILLA GINO-
RIO, JUEZ, demandado; R. SANTAELLA & BROTHERS, INC.
y SANTAELLA DISTRIBUTORS, INC., interventoras.

*Número:* O-72-106 *Resuelto:* 9 de mayo de 1973

380

*Brown, Newsom & Córdova* y *Alberto Picó,* abogados de la peticionaria; *Wallace González Oliver, Secretario de Justicia, Gilberto Gierbolini, Procurador General, J. F. Rodríguez Rivera, Procurador General Interino, Luis A. Micheli* y *Ralph T. Skelly González, Subdirector* y *Fiscal Especial,* respectivamente Oficina de Asuntos Monopolísticos, abogados del Estado Libre Asociado de Puerto Rico; *Fiddler, González & Rodríguez, Salvador Antonnetti Zequeira* y *Pedro Pumarada,* abogados de las interventoras; *McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria* y *Samuel T. Céspedes, amici curiae.*

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Consideramos en este recurso si la aplicación de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. secs. 278 *et seq.,* a los contratos de distribución existentes a la fecha de su vigencia, viola o no la garantía constitucional contra el menoscabo de las obligaciones contractuales. Art. II, Sec. 7 de la Constitución del Estado Libre Asociado. [1]

En el 1941 las partes otorgaron un contrato mediante el cual la interventora distribuiría con exclusividad en el área norte de Puerto Rico las gomas de mascar y confecciones de Sen-Sen manufacturadas por la recurrente Warner Lambert Company. [2] El contrato autorizaba la terminación unilateral disponiendo que el mismo permanecería en todo su vigor y efecto hasta que cualquiera de las partes lo cancelase. A tenor con dicha cláusula la recurrente notificó a la interventora la terminación del contrato a partir del 31 de diciembre de 1971.

---

[1] La Sec. 7 de la Constitución del Estado Libre Asociado dispone: "No se aprobarán leyes que menoscaben las obligaciones contractuales."

[2] Las relaciones contractuales entre las partes comenzaron en el 1924 cuando verbalmente se acordó por la antecesora American Chicle Company otorgarle a R. Santaella & Brothers, Inc., la distribución de los mencionados productos en todo el territorio de Puerto Rico.

Al amparo de la mencionada Ley Núm. 75, que reglamenta la terminación de contratos de distribución, la interventora R. Santaella Brothers, Inc., instó demanda contra la recurrente Warner Lambert Company reclamándole la cantidad de $1,500,000 como compensación por los daños y perjuicios. Conjuntamente con su demanda solicitó del tribunal de instancia un remedio provisional para que se le prohibiera a la recurrente, entre otras cosas, cancelar o dar por terminado el contrato de distribución. A tenor con esta solicitud el tribunal de instancia dictó una orden de interdicto provisional prohibiéndole a la recurrente: a) Cancelar el contrato de distribución de R. Santaella & Brothers, Inc., y/o Santaella Distributors, Inc., o dar por terminado dicho contrato de distribución, o negarse a cumplir o renovar dicho contrato de distribución o tomar cualquier acción que indirectamente permita tener tales efectos; b) Variar en forma alguna las relaciones existentes con los demandantes bajo dicho contrato; c) Gestionar, nombrar o negociar el establecimiento de nuevos distribuidores para áreas comprendidas en el contrato de distribución; d) Menoscabar en forma alguna dicho contrato; e) Mientras se halle en vigor el interdicto las demandadas continuarán entregando mercancía ordenada por las demandantes bajo los mismos términos y condiciones consignados en el contrato; f) Además, que mientras se halle en vigor la orden, se le prohibe a las demandadas aumentar sus precios a las demandantes, y g) se continuará haciendo entrega de la mercancía ordenada por las demandantes.

La orden de interdicto fue dictada bajo las disposiciones del Art. 3A de la Ley Núm. 75 que autoriza al tribunal de instancia a conceder cualquier remedio provisional o medida de naturaleza interdictal en cualquier pleito en que esté envuelta directa o indirectamente la terminación de un contrato de distribución o cualquier acto en menoscabo de las relaciones establecidas entre el principal y el distribuidor. 10 L.P.R.A. sec. 278b-1. No conforme con la orden, la recurrente Warner

Lambert, Inc., instó el presente recurso de *certiorari* aduciendo como fundamentos para su revocación que: 1) la Ley Núm. 75 es de aplicación prospectiva por lo que sus disposiciones no son aplicables a la terminación del contrato entre las partes, y, 2) en su defecto, que de aplicarse dicha ley retroactivamente al contrato entre las partes se violaría la garantía constitucional contra el menoscabo de las obligaciones contractuales. Art. II, Sec. 7 de la Constitución del Estado Libre Asociado. Por otro lado, la interventora R. Santaella & Brothers, Inc., plantea que el contrato de distribución fue novado en el 1967. De tener razón no sería necesario considerar la alegada violación a la garantía constitucional contra el menoscabo de las obligaciones contractuales. El planteamiento de la interventora y el primer fundamento aducido por la recurrente para la revocación de la orden— aplicación prospectiva de la Ley Núm. 75—deben ser considerados con prioridad.

## APLICABILIDAD DE LA LEY NUM. 75 A LOS CONTRATOS EXISTENTES

Procederemos a considerar en primer término si la Ley Núm. 75 se aplica al contrato entre las partes. La contención de la recurrente es que no se aplica porque la Ley Núm. 75 no tiene efecto retroactivo. Arguye que de acuerdo con el Art. 3 del Código Civil para que una ley tenga efecto retroactivo es necesario que expresamente lo disponga, y, como la Ley Núm. 75 no contiene disposición expresa al efecto, la misma no puede aplicarse retroactivamente. [3]

■ La falla del argumento de la recurrente consiste en que se basa en una interpretación literal del Art. 3. Dicho

---

[3] El Art. 3 del Código Civil prescribe que:

"Las leyes no tendrán efecto retroactivo si no dispusieran expresamente lo contrario." 31 L.P.R.A. sec. 3.

artículo sólo tiene el alcance de una regla general de inter-
pretación de estatutos. No es un principio rígido de aplica-
ción absoluta. *Rodríguez* v. *Miller*, 23 D.P.R. 594, 601
(1916); Manresa, I *Comentarios al Código Civil Español*,
pág. 114 (6ta. ed.); Borrell y Soler, I *Derecho Civil Español*,
pág. 14 (1955); De Buen y Bonet, I *Derecho Civil Común
y Foral*, pág. 38; Puig Peña, Tomo I, Vol. 1, *Tratado de Dere-
cho Civil Español*, pág. 436; Scaevola, I *Código Civil*, pág. 234
(6ta. ed.). A juicio de Manresa el artículo en sí es superfluo,
pués, ". . . con la simple utilización de las reglas generales de
interpretación de la ley se llegaría siempre a la misma con-
clusión aunque el artículo del Código no existiera." *op cit.* 114.
Scaevola adopta también una interpretación flexible afir-
mando con Laurent que "el legislador no debe estar enca-
denado por un principio absoluto, que coartaría su libertad
de acción en perjuicio de la sociedad y de los individuos . . . ."
*op cit.* 237.

La doctrina clásica del derecho común de los Estados Uni-
dos exigía, al igual que nuestro Art. 3, una declaración
expresa de la intención legislativa para la aplicación retro-
activa de un estatuto. *Union Pacific R.R. Co.* v. *Laramie Co.*,
231 U.S. 190. Actualmente, sin embargo, prevalece una regla
flexible similar a la que propugna la doctrina española.
*Kindleberger* v. *Lincoln National Bank*, 155 F.2d 281; *Hiatt*
v. *Hilliard*, 180 F.2d 453; *Peony Park* v. *O'Malley*, 223 F.2d
668; *Chambers* v. *Toohey*, 187 Atl. 49.

La jurisprudencia de California comparte también este
enfoque al interpretar una disposición idéntica al Art. 3.
Véanse Código Civil de California, Art. 3, West's Ann. Civil
Code, sec. 3; Código Penal de California, Art. 3, West's Ann.
Penal Code, sec. 3; *Manhein* v. *Superior Court of Los
Angeles*, 478 P.2d 17; *In Re Estrada*, 408 P.2d 948, 952; *De
Genova* v. *State Board of Education*, 367 P.2d 865; *In Re
Cote*, 279 Pac. 131; *In Re Poter's State*, 204 Pac. 826; *East
Bay Municipal Utility District* v. *Garrison*, 218 Pac. 43, 47.

*In Re Estrada,* supra, fija el alcance del Art. 3 en términos similares a los que hemos expuesto anteriormente expresando: "Esta sección simplemente incorpora la regla general de interpretación de que cuando en un estatuto no hay nada que indique una intención contraria se presumirá que el legislador intentó que el estatuto operara prospectivamente y no retroactivamente. Esta regla de interpretación no es una camisa de fuerza. Cuando la Legislatura no ha expresado su intención en forma expresa dicha regla no debe ser seguida ciegamente haciendo caso omiso de los factores que puedan dar luz sobre la intención legislativa. . . ." Id. a la pág. 952.

Considerado pués el Art. 3 como una regla general de interpretación y no como un principio de aplicación inflexible, el planteamiento de la recurrente se reduce propiamente a determinar cual fue la intención legislativa con respecto a la aplicación de la Ley Núm. 75. Ya en este proceso de interpretación la norma que controla la función judicial es la que establece el propio Código Civil en su Art. 19, a saber: "El medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla." 31 L.P.R.A. sec. 19. *Sales* v. *Samac Motor Corp.,* 92 D.P.R. 529 (1965).

Los informes de las comisiones legislativas y la propia Exposición de Motivos de la Ley 75 resumen las razones que motivaron la acción legislativa y sus propósitos. [4] De estos

---

[4] El Informe de la Comisión de Industria y Comercio del Senado lee en parte:

"Recientemente se ha recrudecido el problema creado en el sistema de distribución en Puerto Rico por la acción intempestiva de empresas manufactureras domésticas y del exterior que, sin causa justificada, dan por terminadas sus relaciones con sus distribuidores y agentes en Puerto Rico, tan pronto como éstos han creado un mercado favorable para sus productos, frustando las legítimas expectativas e intereses de los que tan eficientemente han cumplido con sus responsabilidades.

. . . . . . . .

Las disposiciones tradicionales que regulan los contratos entre parti-

documentos podemos inferir la intención del legislador de aplicar las disposiciones de la Ley Núm. 75 a los contratos existentes a la fecha de su vigencia. Como puede verse, estos documentos revelan la profunda preocupación de la Asamblea Legislativa con el problema creado en el sistema de distribución por la acción intempestiva de empresas manufactureras que sin causas justificadas dan por terminadas sus relaciones con sus distribuidores o agentes. La ley fue diseñada con el propósito específico de resolver esa situación evitando los alegados perjuicios que esa práctica estaba ocasionando a la economía.

El propio texto de la ley indica el propósito de cubrir los contratos existentes al disponer en el Art. 2 que: "No empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes al derecho unilateral a poner fin

culares han demostrado no ser eficaces para proteger los legítimos derechos del distribuidor o agente, por lo que se hace necesario legislar para reglamentar esta relación y garantizar que los manufactureros actúen de buena fé, equitativamente, de manera no arbitraria, y preservar al distribuidor o agente los derechos y las expectativas justificadas inherentes a la relación. Además, esto tendrá la consecuencia de dar estabilidad a las relaciones de distribución.

Esta es la grave situación que se intenta remediar con la aprobación de este proyecto. . . ." Vol. 18 Parte 3 *Diario de Sesiones* 1531 (1964).

En sentido similar se manifiesta el Informe de las Comisiones de Comercio y Industria y de lo Jurídico de la Cámara. Véase Vol. 18, Parte 4 *Diario de Sesiones* 1727.

La Exposición de Motivos de la Ley Núm. 75 lee:

"El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios, o agentes, o sin eliminarlos totalmente van gradualmente mermando y menoscabando el alcance de las relaciones previamente establecidas, tan pronto como dichos distribuidores, concesionarios o agentes han creado un mercado favorable y sin tener en cuenta sus intereses legítimos.

"La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, o en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan."

a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, excepto por justa causa." 10 L.P.R.A. sec. 278a.

Imprimirle un efecto prospectivo a la Ley Núm. 75 meramente como consecuencia de la aplicación inflexible del Art. 3, como pretende la peticionaria, llevaría al absurdo de que la ley no se aplicaría a los hechos que tuvo ante sí el legislador. Gaetan y De Jesus: *En Torno a la Ley Número 75 del 24 de junio de 1964*, 34 Rev. Jur. U.P.R. 497, 532 (1965). En efecto, estaríamos derrotando el propósito cardinal del estatuto convirtiéndole en una medida inocua. La eficacia de la Ley Núm. 75 está precisamente en que se propone alterar las relaciones existentes entre manufactureros y distribuidores y no solo las relaciones que se establezcan con posterioridad a su vigencia.

## CUESTIÓN RELATIVA A LA ALEGADA NOVACIÓN DEL CONTRATO DE DISTRIBUCIÓN

En el 1967, estando ya en vigor la Ley Núm. 75, se enmendó el contrato entre las partes para aumentar del 10 al 12 por ciento la comisión del distribuidor. La interventora sostiene que este aumento varió una de las condiciones principales del contrato, y que, siendo esta modificación incompatible con el contrato original, éste quedó extinguido creándose una nueva relación entre las partes con posterioridad a la aprobación de la Ley Núm. 75. De resolverse esta cuestión afirmativamente, no sería necesario considerar si la Ley Núm. 75 viola la garantía constitucional contra el menoscabo de las obligaciones contractuales. Creemos, sin embargo, que no tiene razón la interventora y a continuación expondremos nuestros fundamentos.

El Art. 1157 del Código Civil prescribe, en lo aquí pertinente, que las obligaciones pueden modificarse variando su objeto o condiciones principales. 31 L.P.R.A. sec. 3241. ([5]) No obstante, para que la obligación quede extinguida por otra que la sustituya, el Art. 1158 establece como condición indefectible "que así se declare terminantemente o que la antigua y la nueva sean de todo punto incompatibles." 31 L.P.R.A. sec. 3242. ([6]) En *Caribe Lumber Corp.* v. *Marrero*, 78 D.P.R. 868 (1955) establecimos como pauta interpretativa de este articulado que la novación nunca se presume si no que ha de ser acreditada sin género alguno de duda. También hemos establecido que la novación es siempre una cuestión de intención y que ésta debe inferirse de las circunstancias que rodean cada caso en particular. *Hernández* v. *Burgos*, 40 D.P.R. 460, 463 (1930).

La doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación. Castán, III *Derecho Civil Español, Común y Foral*, 326–327 (9na. ed.); Puig Brutau, I-II *Fundamentos de Derecho Civil*, 399 (1959); Manresa, *op cit.* Tomo 8, Vol. 1, pág. 753 (5ta. ed.); Bonet Ramón, 32 *Revista de Derecho Privado*, pág. 240 (1948). A este respecto el insigne maestro Clemente de Diego señala que "es principio de doctrina y criterio de decisión en el moderno Derecho desligado de las trabas o sujeción del formalismo que inspiraba el Derecho romano, que la voluntad privada campea soberana en los contratos. . . ." *Efectos Novatorios de un Contrato*, I *Revista de Derecho Privado*, 472, 479 (1914).

---

([5]) Dicho artículo lee:

"Las obligaciones pueden modificarse:

1. Variando su objeto o sus condiciones principales.

2. Sustituyendo la persona del deudor.

3. Subrogando a un tercero en los derechos del acreedor."

([6]) El Art. 1158 lee:

"Para que una obligación quede extinguida por otra que la substituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles."

■ La voluntad novatoria—la intención de extinguir la obligación sustituyéndola por una nueva—es pues requisito insoslayable para la novación. La voluntad tiene que ser manifiesta; no puede basarse en equívocos. El Art. 1158 usa un lenguaje radical: "así tiene que declararse terminantemente."

■ La interventora sostiene que el contrato fue novado a base de que se modifica una de sus condiciones principales. No estamos de acuerdo, la modificación de una de las condiciones principales del contrato no necesariamente supone una novación extintiva, si no es ésa la voluntad expresa de las partes. Por otro lado la novación extintiva puede operar aún con la simple modificación de una condición secundaria, si eso es lo que las partes quieren y así lo declaran terminantemente. Bonet Ramón, *op cit.* 240; Azurza, *Nota Sobre Novación* 34 *Revista de Derecho Privado*, 590, 596, 604 (1950); Ennec-Cerus-Lehmann, Tomo II-1 *Derecho de Obligaciones Anotaciones* de *Pérez González y Arguer*, pág. 222 y sig.; Hernández Gil, *El Ambito de la Novación Objetiva Modificativa*, 45 *Revista de Derecho Privado*, pág. 797 (1961). La naturaleza jurídica de la condición—si principal o secundaria —no tiene pués, el peso que supone la contención de la interventora.

La propia letra del Código sostiene esta interpretación de la doctrina. Nótese que el Art. 1157 solamente dice que las obligaciones "pueden modificarse" por variaciones en sus condiciones principales. No dice que se extinguen. Es el Art. 1158 el que dice que las obligaciones pueden extinguirse pero sin expresar nada sobre la naturaleza jurídica de la variación— si es en las condiciones principales o en las secundarias.

La jurisprudencia española no ha seguido del todo esta doctrina adoptando en alguna de sus sentencias un rigor conceptual, rémora de la tradición formalista del Derecho romano. El Derecho romano conceptuaba las obligaciones como inmutables por lo que no se podían modificar sin destruir y sustituir el vínculo. Sólo admitía la novación extintiva

rechazando la puramente modificativa. Este rigorismo forma-lista encontró acogida en algunas sentencias del Tribunal Supremo de España no empece la diferencia conceptual entre la novación clásica y la moderna. Pérez Gonzalez y Alguer, *op cit.* 222; Bonet Román, *op cit.* 240. A este respecto dice Gide: "La novación moderna apenas tiene de común con la novación de otros tiempos más que el nombre." Véase citas en Azurza, *op cit.* 591. Lo anterior explica el porqué frecuen-temente la jurisprudencia española afirma que las variaciones en las condiciones principales conlleva necesariamente la extinción de la obligación.

La doctrina, como hemos visto, rechaza el enfoque restric-tivo de la jurisprudencia española señalando que el concepto de la novación bajo el régimen del Código Civil es amplio, incluyendo tanto la extinción de la obligación existente mediante la creación de una nueva como la simple modifica-ción de una obligación que no tiene efecto extintivo. Castán, *op cit.* 324; Puig Brutau, *op cit.* 397; Manresa, *op cit.* 761. Debemos preservar este sentido amplio del Código fundado en la voluntad de las partes, pues con ello contribuimos a darle a nuestro Derecho la flexibilidad que demanda nuestro desarrollo económico con sus múltiples y variadas transac-ciones contractuales.

Castán advierte las dificultades que entraña el enfoque restrictivo de la novación al establecer una distinción basada en la relatividad del límite que separa lo principal de lo secundario. Por eso, sugiere que debe considerarse no sólo la cláusula modificada, sino también la voluntad de las partes y la significación económica de la modificación. Castán, *op cit.* 334.

▮▮▮ Debe tenerse presente que la extinción de la obliga-ción conlleva la extinción de las garantías y demás derechos accesorios. Art. 1161 del Código Civil; Puig Brutau, *op cit.* 397. Es evidente que una consecuencia tan drástica como ésta sólo puede producirse cuando las partes han tenido clara con-

ciencia de ella. Es por eso que los tribunales deben examinar con cautela las circunstancias particulares de cada caso para hacer la determinación de si ha habido o no novación extintiva.

En el caso de autos aparece del récord que el contrato acordado por las partes en el 1941 consta de ocho cláusulas que cubren en detalles las obligaciones recíprocas de las partes: a) la designación de la interventora como distribuidora exclusiva de los productos de la recurrente, b) la demarcación del territorio que cubre la distribución exclusiva (área norte de Puerto Rico), c) prohibición a la interventora de vender en competencia productos similares, d) obligación de la interventora de informar a la recurrente cualquier violación a la marca de fábrica, e) obligación de la interventora de hacer informes periódicos sobre el inventario y otros informes, f) opción de la recurrente de comprar el inventario de la interventora en caso de cancelación del contrato, g) monto de la comisión y forma de pago, y, h) la facultad de las partes de cancelar el contrato a voluntad.

De todas estas cláusulas, sólo una de ellas, la que fija la comisión, fue modificada. La modificación se verificó en virtud de una breve carta dirigida por la recurrente a la interventora el 17 de enero de 1967 en la que meramente se expresa que a partir del 1ro. de enero de 1967 la comisión sería del 12 por ciento. Dicha carta lee como sigue:— (⁷)

"Enero 17, 1967

Sr. R. Christiansen
Sres. Santaella Distributors, Inc.
Apartado 96
San Juan, Puerto Rico

Estimado Ralph:

Acabo de regresar a la oficina y quiero aprovechar la oportunidad de decirte cuanto disfruté el haberte conocido personal-

---

(⁷) Traducción nuestra.

mente y darte las gracias por todas las cortesías que me brindaste durante mi reciente visita a Puerto Rico.

Creo que la nueva comisión del 12 por ciento, efectiva el 1ro de enero de 1967, ayudará mucho en aumentar las ventas de los productos de Chicle durante el 1967 y años futuros.

Te agradeceré que saludes a Ralph, hijo y a Fred. Dile a Fred que estoy haciendo los arreglos para enviarle una limitada cantidad de Dentyne que puede ser usado en los mejores establecimientos (*outlet*) de San Juan.

Muy sinceramente,
W. J. Sibert"

Ni en el texto de esta carta ni en ningún otro documento aparece una declaración terminante de las partes de extinguir el contrato de 1941 y sustituirlo por otro. Por el contrario, de las propias alegaciones de la interventora aparece que las relaciones entre las partes continuaron en la misma forma que se acordó en el contrato de 1941, salvo el aumento de la comisión. Es decir, las partes continuaron sus relaciones asumiendo que estaba vigente—como evidentemente lo estaba—el contrato de 1941. Esto en sí es suficiente para demostrar la intención de *no* novar, contrario a la contención de la interventora.

Tampoco hay incompatibilidad entre el contrato de 1941 y el aumento de la comisión. La incompatibilidad a que se refiere el Código es a la absoluta, a la excluyente "de todo punto". Art. 1158, *supra*. Aquí, por el contrario, la modificación aumentando la comisión y el contrato de 1941 son perfectamente armonizables. Se trata propiamente de una mera alteración cuantitativa del objeto del contrato que deja íntegra la estructura misma de la obligación. La doctrina considera que la modificación al *quantum* debido no supone un *animus novandi*. Azurza, *op cit.* 606; Castán, *op cit.* 332; Puig Brutau, *op cit.* 399.

En resumen, no apareciendo en forma alguna la declaración terminante que exige el Art. 1157 para la extin-

ción de las obligaciones por novación ni habiendo incompatibilidad entre el contrato de 1941 y el aumento de la comisión de 1967, es forzoso concluir que no operó la novación alegada por la interventora, estando pués, en todo su efecto y vigor el contrato original de las partes al aprobarse la Ley Núm. 75.

## VIOLACIÓN DE LA GARANTÍA CONTRA EL MENOSCABO DE LAS OBLIGACIONES CONTRACTUALES

Resuelto lo anterior consideramos ahora si la aplicación de la Ley Núm. 75 a los contratos existentes a la fecha de su vigencia viola o no la disposición constitucional que prohibe el menoscabo de las obligaciones contractuales. Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, *supra.*

Estamos de acuerdo que esta prohibición no es absoluta y que debe interpretarse en armonía con otras disposiciones constitucionales. La contratación privada no puede, en principio, impedir el ejercicio del poder de reglamentación del Estado. *Sierra, Comisionado* v. *San Miguel,* 70 D.P.R. 604, 606 (1949); *Hudson Water Co.* v. *McCarter,* 209 U.S. 349; *Manigault* v. *Spring,* 199 U.S. 473, 480. La Asamblea Legislativa tiene, en efecto, amplios poderes para aprobar medidas razonables con el propósito de salvaguardar los intereses fundamentales del pueblo y promover el bien común. No obstante, el poder de reglamentación, por amplio que sea, no es ilimitado. Su ejercicio nunca puede ser arbitrario o irrazonable. *E.L.A.* v. *Márquez,* 93 D.P.R. 393, 403, (1966). De otra manera, ni la garantía contra el menoscabo de las obligaciones contractuales ni ninguna otra garantía de la Constitución tendrían valor alguno, pués todas quedarían sometidas al poder omnímodo del Estado. Vale recordar que las garantías constitucionales se formularon precisamente con el propósito de restringir el ejercicio arbitrario y opresivo de los poderes del Estado. Ellas sirven de broquel para la protección de los ciudadanos contra la opresión de la mayoría.

La certeza en las consecuencias legales de lo pactado constituye el fundamento racional en que se basa la garantía contra el menoscabo de las obligaciones contractuales. En principio, la ley, no debe modificar esas consecuencias en perjuicio de uno de los contratantes. Las partes así lo confían. La estabilidad en las relaciones contractuales es un valor social que requiere protección en el ordenamiento jurídico. Por supuesto, como ya expresamos, por razones superiores de orden público, esta protección puede quedar subordinada al poder de reglamentación del Estado. *Cf. El Paso* v. *Simmons*, 379 U.S. 497, 506.

Al considerar la validez de estatutos bajo la cláusula de menoscabo el criterio aplicable es el de razonabilidad. La función del tribunal consiste en establecer un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. Esencialmente es una cuestión de debido procedimiento de ley. A este respecto se ha sostenido que los criterios de razonabilidad para determinar la validez de la acción legislativa son los mismos bien bajo la garantía del debido procedimiento de ley como bajo la garantía contra el menoscabo de las obligaciones contractuales. Por consecuencia, aunque no existiera la garantía contra el menoscabo de las obligaciones —como no existe en cuanto al Congreso ya que la prohibición del Art. I, Sec. 10, va dirigida a los estados exclusivamente— siempre podría llegarse al mismo resultado aplicando la cláusula del debido procedimiento de ley. [8] S. Lawson, *Constitutional and Legislative Considerations in Retroactive Lawmaking*, 48 Calif. L. Rev. 216; Hale, *The Supreme Court and the Contract Clause*, 57 Harv. L. Rev. 852, 890; *Comentario*,

---

[8] La prohibición establecida en el Art. I, Sec. 10, dispone en lo pertinente:
 "Ningún estado . . . aprobará . . . ley *ex post facto* o que menoscabe la obligación de los contratos, . . . ."

32 Mich. L. Rev. 71. Como casos ilustrativos en los cuales se ha aplicado el mismo criterio puede verse a *Block* v. *Hirsh*, 256 U.S. 135 y *Marcus Brown Co.* v. *Feldman*, 256, U.S. 170. Ambos casos sostuvieron la constitucionalidad de la aplicación de un estatuto de control de alquileres a los contratos existentes; uno, bajo la cláusula del debido procedimiento de ley; y el otro, bajo la cláusula contra el menoscabo de las obligaciones contractuales.

La razonabilidad del estatuto ·se determina tomando en consideración principalmente la sustancialidad del interés público promovido por el mismo y la dimensión del menoscabo ocasionado por su aplicación retroactiva. Véanse: *Home Building & Loan Association* v. *Blaisdell*, 290 U.S. 398; Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 701. Mientras más grave sea el mal social que el estatuto intenta remediar más grande es el interés público envuelto, y, por tanto, mayor justificación para su aplicación retroactiva. Es por eso que tradicionalmente se ha reconocido la supremacía del poder de reglamentación. en tales áreas como la venta de licores, la venta de drogas, la operación de destilerías y de salas de juego, no empece los contratos que puedan haberse convenido previamente en esas actividades. *Manigault* v. *Spring*, supra; *Home Building & Loan Association* v. *Blaisdell*, supra, a la pág. 435.

Igualmente se ha juzgado razonable la aplicación retroactiva de estatutos en situaciones de emergencia creadas por el impacto de una inflación o recesión económica. Las emergencias pueden ser provocadas por diferentes causas, bien por un conflicto bélico, por un desastre de la naturaleza o por desajustes económicos creados por una inflación en los precios o una depresión de los valores. Para una discusión general sobre los poderes gubernamentales para afrontar emergencias por desajustes en la economía véase las anota-

ciones *Governmental Powers in Peace-Time Emergency* en 86 A.L.R. 1539 y 96 A.L.R. 826.

En *Home Building & Loan Association* v. *Blaisdell*, supra, el Tribunal Supremo de Estados Unidos sostuvo la constitucionalidad de una ley de moratoria mediante la cual se autorizaba a los tribunales a posponer la ejecución de propiedades por deuda y a extender, durante la emergencia declarada por la Legislatura, los períodos de redención; en *Block* v. *Hirsh*, supra, se sostuvo la constitucionalidad de la aplicación retroactiva de una ley de control de alquileres expresando el Juez Holmes que: "Un límite a la vigencia para superar una dificultad transitoria, puede muy bien justificar una ley que no podría sostenerse como una medida permanente." (traducción nuestra) ; en *Fleming* v. *Rhodes*, 331 U.S. 100, se sostuvo la constitucionalidad de la aplicación retroactiva de una ley de control de precios; en *Veix* v. *Sixth Ward Assn.*, 310 U.S. 32, se sostuvo la aplicación retroactiva de una ley regulando la redención y retiro de acciones de asociaciones de préstamos a base de que: "Estamos bregando aquí con instituciones financieras de mayor importancia para el sistema de crédito del Estado. El Estado retiene poderes de reglamentación adecuado para reglamentar por ley el retiro de acciones." (traducción nuestra). El estatuto en este caso tenía el propósito de evitar la quiebra de las asociaciones de préstamos debido a una depresión en los valores de bienes inmuebles.

Todos estos casos envuelven legislación revestida de gran interés público. Los estatutos en cuestión fueron aprobados para remediar un grave mal social con motivo de la emergencia creada por una depresión económica. Pero, además, todos estos casos tienen el factor adicional de que el menoscabo ocasionado por la aplicación retroactiva del estatuto no afectaba la integridad de la obligación. Se trataba, en efecto, de simples menoscabos transitorios, situación muy distinta a la de la Ley Núm. 75.

398

Como vimos anteriormente, la Ley Núm. 75 tiene como propósito expreso remediar la situación de los distribuidores por la acción intempestiva de empresas manufactureras que dan por terminado los contratos de distribución sin causa justificada. (9) La Exposición de Motivos de dicha ley declaró que era vital para la economía del país, al interés público y al bienestar general, la razonable estabilidad de las relaciones de distribución.

Ni en la Exposición de Motivos, ni en los informes de las comisiones legislativas se aduce un solo hecho para sostener la anterior afirmación. No se celebraron vistas públicas para ventilar la situación a que alude la Ley Núm. 75. No hubo siquiera discusión en el hemiciclo de las cámaras al aprobarse la ley. No tenemos base para tomar conocimiento judicial del efecto de la terminación de los contratos de distribución en la economía de Puerto Rico o en la sociedad puertorriqueña. Nos merecen profundo respeto las declaraciones legislativas sobre los males sociales que el legislador intenta remediar. Pero tales expresiones deben estar fundadas en hechos de conocimiento general y no constituir un mero fíat legislativo.

Por el contrario, frente a la ausencia de hechos que justifiquen la declaración legislativa sobre la necesidad de la Ley Núm. 75 encontramos que la operación del agente exclusivo en la distribución de productos alimenticios se ha objetado porque su comisión constituye un costo adicional que tiene que pagar el consumidor. Véase: Galbraith, John Kenneth, *Marketing Efficiency in Puerto Rico*, pág. 195, Harvard University Press, Cambridge, Mass., 1955. (10) En forma

---

(9) Véase escolio 4, *supra*.

(10) La obra citada comprende un exhaustivo estudio del prestigioso economista John Kenneth Galbraith sobre las deficiencias del sistema del mercadeo de productos alimenticios en Puerto Rico. Dicho estudio fue auspiciado por el Centro de Investigaciones Sociales de la Universidad de Puerto Rico en el 1955. En el capítulo 15 de este estudio se recomiendan medidas para mejorar la eficiencia en el mercadeo de productos alimenti-

alguna insinuamos que la eliminación del distribuidor exclusivo redundaría en una reducción de costos de distribución. Aclaramos también que todas las anteriores consideraciones se refieren a la validez de la aplicación retroactiva de la Ley Núm. 75 que en nada prejuzgan la facultad legislativa para reglamentar los contratos de distribución en forma prospectiva. La Asamblea Legislativa tiene amplios poderes para reglamentar prácticas que considere perjudiciales al sistema de mercadeo, salvo que al hacerlo infrija una disposición específica de la Constitución, como se infringe en el caso de autos la cláusula contra el menoscabo de las obligaciones contractuales. *Ferguson* v. *Skrupa,* 372 U.S. 726.

El derecho vigente al momento de las partes en el caso de autos formalizar el contrato de distribución permitía la terminación unilateral. No existía en Puerto Rico una causa de acción por razón de la terminación del contrato cuando las partes no habían fijado un plazo definido. *Arecibo Motors Co.* v. *Caribe Motors Corp.,* 60 D.P.R. 401 (1942). La Ley Núm. 75 creó una causa de acción a favor del distribuidor por la terminación sin justa causa, no obstante haber acordado las partes la terminación unilateral. El efecto práctico de la Ley Núm. 75 es prorrogar indefinidamente el contrato, a menos que haya justa causa para la terminación, o, que el principal esté dispuesto a pagar daños que pueden resultar cuantiosos. La ley define justa causa como el "incumplimiento de algunas de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios." Art. 1, 10 L.P.R.A. sec. 278. Nótese que la

cios discutiéndose específicamente la posibilidad de eliminar a los agentes distribuidores por ser intermediarios que incrementan los precios o restringir sus actividades mediante la aplicación de las leyes federales antimonopolísticas.

justa causa se limita a actos imputables al distribuidor. Solamente cuando el distribuidor incurra en incumplimiento de algunas de las condiciones esenciales o afecte adversamente en forma sustancial los intereses del principal, éste puede dar por terminado el contrato sin reparación de daños. No se admite la buena fe del principal en la terminación del contrato, ni su derecho a establecer su propio sistema de distribución o hacer ajustes al sistema de distribución que de buena fe considere necesario para incrementar su mercado.

La definición de justa causa tiene el efecto de privar al principal del derecho de dar por terminado el contrato en cualquier momento. Constituye una modificación sustancial del contrato mediante la cual se transfiere, de un patrimonio a otro, un derecho contractual con un valor económico apreciable. El menoscabo es mayor cuando consideramos que justa causa es una defensa afirmativa, y, como tal, el peso de la prueba recae en el principal. De no existir justa causa, el principal habrá ejecutado un acto torticero contra el distribuidor y deberá indemnizarle a base de una compleja fórmula de daños. Art. 3, 10 L.P.R.A. sec. 278b. (11)

---

(11) El Art. 3 prescribe que la cuantía de los daños se fijará a base de los siguientes factores:

"(a) el valor actual de lo invertido por el distribuidor para la adquisición y la adecuación de locales, equipo, instalaciones, mobiliario y útiles, en la medida en que éstos no fueren fácil y razonablemente aprovechables para alguna otra actividad a que el distribuidor estuviere normalmente dedicado;

"(b) el costo de las mercaderías, partes, piezas, accesorios y útiles que el distribuidor tenga en existencia, y de cuya venta o explotación no pueda beneficiarse;

"(c) la plusvalía del negocio, o aquella parte de ésta atribuible a la distribución de la mercancía o la prestación de los servicios de que se trate, a ser determinada dicha plusvalía tomando en consideración los siguientes factores:

(1) número de años que el distribuidor ha tenido a su cargo la distribución;

(2) volumen actual de distribución de la mercancía o prestación de los servicios de que se trate y la proporción que representa en el negocio del distribuidor;

(3) proporción del mercado de Puerto Rico que dicho volumen

Como se puede ver, no se trata de un simple menoscabo de carácter transitorio como en los casos mencionados anteriormente que envuelven legislación de emergencia. Por el contrario, aquí se mengua sustancialmente la posición del principal en sus relaciones contractuales con el distribuidor. Un derecho fundamental del principal—el de dar por terminado el contrato unilateralmente—ha sido demolido bajo el imperio de la aplicación retroactiva de la Ley Núm. 75. Tal menoscabo; aun con una justificación más sólida que la que provocó la aprobación de la Ley Núm. 75, es irrazonable, arbitrario y opresivo.

■ En un esfuerzo por cerrar la grieta que vicia la validez del estatuto, la interventora nos sugiere que adoptemos una interpretación más restrictiva de la definición de justa causa. Podemos, sin duda alguna, ir más allá de la letra de la ley para cumplir su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Pero es que la letra en este caso refleja fielmente el espíritu de la ley. La intención clara del legislador fue precisamente impedir la terminación unilateral de los contratos de distribución por causas que no fueran imputables al distribuidor. Ni hay ambigüedad en la letra de la ley ni dudas sobre la intención legislativa. Ampliar por interpretación judicial la definición de justa causa, como sugiere la interventora, subvertiría el verdadero sentido y propósito del estatuto.

Arguye el Procurador General en su informe que la Ley Núm. 75, y específicamente la definición de justa causa, se inspiró en la legislación federal que reglamenta las relaciones

representa;
 (4) cualquier otro factor que ayude a establecer equitativamente el monto de dicha plusvalía

"(d) el monto de los beneficios que se hayan obtenido en la distribución de la mercancía o en la prestación de los servicios, según sea el caso, durante los últimos cinco años o si no llegaren a cinco, cinco veces el promedio de los beneficios anuales obtenidos durante los últimos años, cualesquiera que fuesen."

de distribución en la industria de automóviles. Se refiere a la ley conocida como Automobile Dealer's Day in Court Act, 15 U.S.C.A. secs. 1221–1225. No tiene razón.

La ley federal tiene objetivos y propósitos distintos a los de la Ley Núm. 75. Arranca de un contexto antimonopolístico para remediar la menosvalía económica de los agentes distribuidores de automóviles en sus negociaciones con los fabricantes. El desbalance existente en el poder de regateo de los distribuidores permitía a los fabricantes imponerles condiciones irrazonables e inequitativas mediante amenazas de cancelarles las franquicias. Para evitar esas prácticas abusivas se aprobó el Automobile Dealer's Day in Court Act, *supra*, la cual creó a favor del distribuidor una causa de acción cuando el manufacturero no actúa de buena fe en el desempeño de la obligaciones contraídas en la franquicia o en la terminación, cancelación o la negativa a renovar la franquicia. 70 Stat. 1125, 15 U.S.C.A. sec. 1222, 3 *U.S. Code Congressional and Administrative News* 4596 *et seq.* (1956).

 El concepto de buena fe de la ley federal es distinto al de justa causa de la Ley Núm. 75. Buena fe se define por aquella como el deber de ambas partes de actuar mutuamente de una manera razonable y equitativa para garantizarse el uno al otro libertad de coerción, intimidación o amenaza de coerción o intimidación. 15 U.S.C.A. sec. 1221. Las palabras claves en la definición son coerción e intimidación. La mera terminación o negativa a renovar la franquicia no da base a una causa de acción, a menos que tal cancelación o negativa a renovar sea parte de un contexto de coacción o intimidación. *Milos* v. *Ford Motor Co.* 317 F.2d 712; Anno. *Validity and Construction of Statute Regulating Dealings Between Automobile Manufacturers, Distributors, and Dealers,* 7 A.L.R.3d 1173–1183.

La ley federal no garantiza exclusividad al distribuidor. El fabricante puede designar distribuidores adicionales en la comunidad, siempre que no lo haga como una medida de

coacción o intimidación. La designación de distribuidores adicionales se considera un método normal de competencia, lo que está en consonancia con los objetivos antimonopolísticos de la ley. 3 *U.S. Code Congressional and Administrative News* 4604.

La medida de daños en la ley federal es sencilla: los realmente sufridos y las costas, sin incluir honorarios de abogados. Id. 4602. Contrario a la Ley 75, el peso de demostrar buena fe en la ley federal recae sobre el distribuidor. A éste corresponde probar todos los elementos de la causa de acción. *Milo* v. *Ford Motor Co.*, supra.

Someramente hemos señalado algunos rasgos que destacan las diferencias fundamentales entre la Ley Núm. 75 y el Automobile Dealer's Day in Court Act con el propósito de demostrar que la jurisprudencia interpretativa de ésta tiene muy poco valor persuasivo para nosotros en este caso. Tampoco tiene relevancia la jurisprudencia de los estados federados por tratarse de estatutos redactados con propósitos y objetivos distintos a los de la Ley Núm. 75.

■ En base a las razones que hemos expuesto en el curso de esta opinión, concluímos que la Ley Núm. 75 en su aplicación a los contratos existentes a la fecha de su vigencia, viola la garantía constitucional contra el menoscabo de las obligaciones contractuales, Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, y por lo tanto, es inconstitucional.

*Se dictará sentencia dejando sin efecto la orden de entredicho recurrida y se devolverá el caso para ulteriores procedimientos consistentes con lo aquí expuesto.*

Los Jueces Asociados, Señores Cadilla Ginorio e Irizarry Yunqué, no intervinieron.