Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se une el Juez Presidente Señor Hernández Denton.
El caso que tenemos ante nuestra consideración nos exige hacer un balance entre dos intereses muy importantes. Por un lado, el interés público del Estado de *920 garantizar el cumplimiento de sus obligaciones a través de medidas legislativas que sean económicamente viables y de asegurarse de contar con el presupuesto necesario para brindar los servicios básicos de salud, educación y seguri-dad pública a toda la ciudadanía. Por el otro, el interés de las maestras y los maestros del sistema de enseñanza pú-blica en que el Estado cumpla con las condiciones de retiro vigentes al momento de contratación. Ambos, el Estado y los maestros, sostienen que su motivación principal es pro-teger el retiro digno de la clase magisterial. A esa preocu-pación también responde este disenso.
Debemos evaluar la validez constitucional de la Ley Núm. 160-2013, Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, aprobada el 24 de diciembre de 2013, que reforma el Sistema de Retiro para Maestros de Puerto Rico (Sistema de Retiro) estable-cido por la Ley Núm. 91-2004 (18 LPRA see. 391 et seq.). Entre las modificaciones al Sistema de Retiro están su transformación de un plan de beneficios definidos a uno de aportación definida. La ley también aumenta la edad de retiro y las aportaciones individuales y patronales. Ade-más, elimina los beneficios adicionales creados mediante leyes especiales.
El informe presentado por el Hon. Angel Pagán Ocasio, a quien designamos como Comisionado Especial para recoger la prueba presentada por las partes,(1) describe un sistema de retiro moribundo, afectado por la morosidad fiscal del Estado en su financiamiento y que no ha resultado ser *921 sustentable y autosuficiente.(2) Añade que los activos del sistema son menores que los pasivos, por lo que, ante la insuficiencia de ingresos provenientes de las aportaciones o del rendimiento de las inversiones, se ha recurrido a la venta de los activos no líquidos para poder obtener efectivo para el pago de los beneficios.(3) Esto ha creado, al 30 de junio de 2013, un déficit actuarial de $10,251,273,000(4) y un déficit de efectivo de $334.5 millones.(5) El informe revela que la situación fiscal del Sistema de Retiro para Maestros es crítica y amerita atención inmediata y que, debido a la crisis gubernamental por la que atraviesa Puerto Rico, su reformulación debe atenderse con premura.
Ante el Comisionado, las partes demandantes y deman-dadas estipularon que la Reforma del Sistema de Retiro de Maestros representaba un menoscabo de las obligaciones del Estado, pues afecta adversamente las expectativas de los maestros respecto a su retiro.(6) También reconocieron que, según el Informe de Valorización Actuarial preparado por Milliman, si el Gobierno no inyecta fondos adicionales a los que por ley debe aportar, los activos del sistema se terminarían para el año fiscal 2019-2020.(7) De no hacerse un cambio, el Fondo General del Gobierno tendría que asu-mir las deficiencias entre los ingresos del sistema y el costo del pago de las pensiones y el gasto administrativo del sistema. (8)
Ante esta crisis en las finanzas del sistema, la Asamblea Legislativa aprobó el proyecto que reforma el Sistema de *922 Retiro para Maestros. El Estado alega que su intención fue garantizar que los maestros pudieran recibir el pago de sus pensiones. Los maestros, por su parte, alegan que la apli-cación retroactiva del nuevo sistema de retiro vulnera la cláusula constitucional que prohíbe a la Legislatura me-noscabar las obligaciones contractuales.(9)
El propósito principal de dicha limitación constitucional es asegurar la estabilidad del tráfico jurídico y promover la certeza de las relaciones contractuales.(10) Sin embargo, la protección constitucional contra el menoscabo de obligacio-nes contractuales no es absoluta y es susceptible de ser balanceada con el poder de reglamentación del Estado.(11) Y es que en nuestro ordenamiento el Estado tiene el poder para reglamentar y promover medidas que salvaguarden el bienestar de la sociedad. Por eso, no todo menoscabo contractual es inconstitucional, su validez será analizada a la luz de los criterios jurídicos establecidos para ello.(12)
En ocasiones anteriores hemos confrontado la necesidad de establecer este balance y hemos desarrollado unos cri-terios para determinar la constitucionalidad de una ley al amparo de la cláusula de menoscabo de las obligaciones contractuales en las que el Estado es parte. En síntesis, la modificación evaluada debe ser, además de razonable, ne-cesaria para adelantar el propósito gubernamental importante.(13) De hecho, hemos tenido la oportunidad de atender este asunto en situaciones de hechos muy pareci-das al presente, al considerar la constitucionalidad de la *923 reforma de otros sistemas de retiro para empleados públicos. (14)
Desde el 1987, en Bayrón Toro v. Serra, este Tribunal se apartó de la noción de que las pensiones de los sistemas de retiro del gobierno eran una gracia del estado.(15) En aquel momento resolvimos que los participantes de un Sistema de Retiro del Gobierno tenían un interés propietario de naturaleza contractual.(16) Este interés nacía con el ingreso del empleado al sistema y estaba protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales. Por ello, “antes de que pueda acogerse a la jubilación, los términos del sistema de retiro pueden ser enmendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar la solvencia actuarial del mismo”. (17) Sin embargo, explicamos que una vez el empleado se retire, su pensión no puede ser cambiada.
En aquella ocasión tuvimos la oportunidad de examinar la constitucionalidad de las enmiendas al Reglamento del Sistema de Retiro de la Universidad de Puerto Rico. Entre las modificaciones analizadas se encontraba un aumento en la edad requerida para que un participante de ese sis-tema, con por lo menos 30 años de servicio, pudiera reti-rarse y recibir el 75% de su compensación promedio. Ade-más, se limitaba la elegibilidad para recibir la anualidad de retiro por años de servicio y se aumentaba la aportación individual requerida al fondo del sistema. En aquel enton-ces tomamos en consideración que el sistema de retiro de la Universidad se encontraba en una “grave crisis actuarial, que ponía al sistema en peligro de tener que liquidar sus activos”.(18) Por eso, las modificaciones eran “esenciales *924 para mantener el fondo en estado solvente”.(19) Ante el interés de mantener la solvencia del sistema, expresamos que el Estado debe tener la flexibilidad de hacer modifica-ciones razonables y necesarias para fortalecer los cimientos del sistema. Concluimos que reconocerle esta facultad era indispensable para el éxito del sistema de retiro. Por lo tanto, resolvimos que las modificaciones fueron razonables y necesarias, dirigidas a salvar la solvencia actuarial del mismo.
Recientemente, en Trinidad Hernández et al. v. ELA et al., 188 DPR 828 (2013), evaluamos la situación delicada del reclamo de menoscabo inconstitucional de obligaciones contractuales de cientos de empleados públicos ante la Ley Núm. 3-2013 que reformaba el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades. En síntesis, la reforma congeló la acumulación de beneficios y aumentó la edad de retiro de manera escalonada para aquellos participantes que se encontraban cerca de dicha edad, de manera similar a la llamada “ventana” de retiro de la ley que está ahora ante nuestra consideración. Además, incrementó la aportación individual, cambió los empleados públicos activos a un plan de contribución definida y modificó los beneficios otorgados por leyes especiales para utilizar el ahorro en la producción de fondos para el sistema. Tras determinar que dicha reforma menoscabó sustancialmente las obligaciones del Estado y de los empleados, evaluamos si las modificaciones perseguían el interés importante en beneficio del bienestar general de asegurar la solvencia actuarial del sistema.
Nuestro análisis tomó en consideración que para el año fiscal 2018-2019, el sistema de retiro de los empleados pú-blicos se quedaría sin fondos suficientes para cubrir el pago de la pensión. Además, notamos que la magnitud del déficit del Sistema de Retiro de Empleados Públicos y el de *925 Maestros era equivalente a más de cuatro veces el ingreso anual del Fondo General.(20) A la luz de esos criterios, entendimos que la reforma de la Ley Núm. 3-2013 era razo-nable y necesaria porque garantizaba la solvencia del sistema.(21) Finalmente, reafirmamos que la determinación de la Asamblea Legislativa en torno a las medidas aproba-das constituyó un ejercicio de política pública que merece la deferencia del poder judicial en nuestro sistema de se-paración de poderes.(22) Concluimos que la Ley Núm. 3-2013 fue un ejercicio de la prerrogativa de la Asamblea Legislativa dirigido a adoptar medidas para evitar que el sistema de retiro de empleados públicos colapsara.(23) Además, sostuvimos que la exposición de motivos sostenía la conclusión que la ley era razonable y necesaria para atender la crisis financiera que atentaba contra la aquel sistema.
Sin embargo, hoy, ante una ley que prácticamente tiene las mismas consecuencias para las maestras y los maestros que tuvo la Ley Núm. 3-2013 para los empleados públicos y que persigue el mismo propósito de asegurar la solvencia del sistema, una mayoría de este Tribunal, al aplicar el mismo estándar de revisión, llega a una conclusión distinta. La Opinión del Tribunal resuelve que, según la prohibición constitucional al menoscabo de obligaciones contractuales, la Ley Núm. 160-2013 “es irrazonable, y por consiguiente, inconstitucional en la medida que altera el derecho contractual que tienen los peticionarios demandantes sobre su pensión de retiro, conforme a la Ley Núm. 91-2004”.(24)
Entre las disposiciones no avaladas en la Opinión se encuentran: el aumento en la edad mínima para quienes se *926 jubilen a partir del 1 de agosto de 2013;(25) el aumento a 62 años en la edad mínima de retiro para maestros de nuevo ingreso,(26) el aumento en la aportación individual de los maestros(27) y la imposición de un tope de 33% del salario mensual promediado a cinco años a las pensiones por incapacidad.(28) Además, se deroga la disposición que esta-blece una pensión mínima de $1,625 para los maestros ac-tivos al 31 de julio de 2014 que no se puedan retirar a esa fecha con una pensión cuyo beneficio sea igual o mayor a 65% del salario promediado(29) y la disposición que excluye del derecho a pensión mínima a los maestros activos que se jubilen con menos de 30 años de servicio a partir del 1 de agosto de 2014.(30) Asimismo se declara la inconstituciona-lidad de la disposición que impide que ciertos participantes puedan solicitar el reembolso de sus aportaciones,(31) y la que crea una ventana de retiro incentivado.(32)
Específicamente, al aplicar el criterio de razonabilidad, la mayoría concluye que el Estado no consideró el impacto que tendría el retiro masivo de maestros, incentivados por la ventana de retiro temprano creada por el Artículo 4.4(a) de la ley, y por la eliminación de los beneficios concedidos por leyes especiales para aquellos participantes que se re-tiren a partir del 1 de agosto de 2014. En cuanto a esto concluye que un retiro masivo colocaría al sistema en una posición más precaria, agotándose los activos del sistema en una fecha anterior al año 2020. Entiende que el Estado no refutó las alegaciones de las partes demandantes y con-cluye que “la Ley Núm. 160-2013 no adelanta el interés estatal importante requerido por nuestro ordenamiento *927 constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema”. (Enfasis suprimido). (33)
Para llegar a esta conclusión la mayoría utiliza princi-palmente dos informes periciales presentados por la Aso-ciación de Maestros de Puerto Rico y la Organización de Directores y Administradores Escolares de Puerto Rico (ODAE). Es importante recordar que en el proceso ante el Comisionado Especial no se celebró una vista evidenciaría, sino que las partes acordaron presentar el caso mediante declaraciones juradas y prueba pericial documental. Por eso, al no haber determinación alguna sobre la credibilidad de los testigos y los peritos, el valor probatorio que otorgue-mos a los informes periciales dependerá únicamente de cuan bien sustentados estén sus planteamientos y, sobre todo, sus conclusiones.
El informe del perito de la ODAE, el actuario José M. Pérez Díaz, advierte que su informe no representa una valoración actuarial del Sistema de Retiro. Admite que la valoración realizada por los actuarios de Milliman cumple con los elementos requeridos por los Actuarial Standards of Practice de la profesión actuarial en los EE.UU.(34) Expresa que utilizó los datos, resultados y conclusiones de Milliman para su estudio. El actuario Pérez Díaz sostiene que desarrolló un “modelo financiero bastante complejo” para predecir el impacto de la Ley Núm. 160-2013 en el Sistema de Retiro a partir del 2013.
El informe no describe cuál fue el modelo que desarrolló ni los fundamentos y métodos que utilizó. Expresa de ma-nera escueta que “el efecto principal de la ley sería extender la cantidad de activos del sistema hasta el año 2038, el mismo año en que el sistema comenzaría con la misma cantidad de activos que comenzó en el 2013. O sea, el sis- *928 tema prácticamente no desarrollaría activos del 2013 a 2038 dada la necesidad tan grande de pagar beneficios de pensiones. Luego los activos se agotarían completamente en el 2057”. (Enfasis suprimido).(35) El actuario entonces concluye que el retiro repentino de miles de participantes aceleraría el colapso del sistema hasta una fecha anterior al 2020. Sin embargo, el actuario no explica cómo llegó a esta conclusión ni qué factores consideró en su análisis. Me parece que este informe no merece la credibilidad que le otorga la mayoría para declarar la irrazonabilidad de la medida.
El informe de los economistas Alameda y González Martínez padece de la misma debilidad.(36) La cita a la que hace referencia la Opinión mayoritaria tampoco está sustentada por una explicación satisfactoria del modelo utilizado para llegar a la conclusión de que si se retiran 7,000, 10,000 o 12,000 maestros se provocará una erosión signifi-cativa de los fondos del Sistema. Si bien es obvio que un aumento en la cantidad de pensionados creará una carga mayor al Sistema, ninguno de los informes considera si la reforma a la estructura del sistema, así como las medidas que le allegarían aportaciones adicionales, lograrían paliar el efecto de un retiro masivo de maestros. No es suficiente la prueba presentada para concluir que la reforma al sis-tema aprobada por la Legislatura empeoraría la solvencia del sistema.
Por otro lado, consta en el historial legislativo del proyecto de ley, que la Directora Ejecutiva Interina del Sistema de Retiro para Maestros, Sra. Wanda Santiago Ló *929 pez, señaló la importancia de observar el número de maestros que se jubilarían ya que ello regularía que el sistema asumiera más obligaciones.(37) La señora Santiago López recomendó que se evaluara la posibilidad de adelantar la fecha de comienzo de la Aportación Adicional Anual y de la Aportación Uniforme para la Justicia Magisterial. Además, en su declaración jurada la Directora señaló que “aun con el impacto de la ventana creada por la Ley 160-2013, las aportaciones del Fondo General necesarias para solventar el Sistema están muy por debajo de los aproximados $562 millones anuales adicionales que serían necesarios aportar del Fondo General para la subsistencia del Sistema en ausencia de la Reforma”.(38)
La mayoría de este Tribunal entiende que la Ley Núm. 160-2013 es irrazonable porque no adelanta el interés gu-bernamental importante requerido por la jurisprudencia para este tipo de situación: asegurar la solvencia del Sis-tema de Retiro. Llega a esta conclusión partiendo de una premisa, que si bien es posible, es especulativa. La mayo-ría entiende que la ley podría precipitar un retiro masivo de maestros y maestras. De ahí, salta a la conclusión de que el retiro en masa causará el colapso del sistema.
Sin embargo, el historial legislativo revela que la Legis-latura tuvo ante su consideración el impacto negativo po-tencial en el flujo de caja del Sistema de Retiro que causa-ría el retiro en masa de maestros y maestras ante la reforma de la ley y que se identificó al menos una alterna-tiva en la eventualidad de que esto ocurriera. Además, se constató que, de surgir el problema, lo que se necesitaría para enfrentarlo sería muchos menos que lo que haría falta *930 para solventar el sistema existente. Por lo tanto, el legis-lador tuvo ante sí el problema, lo consideró y determinó que no era necesario ni conveniente hacer nada hasta tanto se precisara su verdadero impacto, esto es, hasta tanto y en cuanto se pasara de la especulación a la realidad.
Siendo ello así la decisión de la mayoritaria constituye una intervención en las prerrogativas de la Asamblea Le-gislativa que es contraria a la deferencia requerida por nuestro sistema de separación de poderes. No debemos mi-nar los esfuerzos de las ramas políticas de atender los graves problemas socioeconómicos que enfrentamos actual-mente como país. Este es un problema de gran complejidad ligado a la situación fiscal precaria del Gobierno Central. El Estado ha enfatizado en que esta medida no es una medida aislada sino que forma parte de la restructuración de todos los sistemas de retiro público así como de los gas-tos del Gobierno Central. La evaluación de esta medida no puede basarse meramente en la posibilidad de que surja una situación en particular que produzca el efecto contra-rio al deseado. Una decisión legislativa de gran enverga-dura no debe ser descartada por una especulación basada en conclusiones no fundamentadas.
En vista de lo anterior y por entender que la Legislatura actuó motivada por la obligación de proteger el interés mayor de garantizar que los maestros y las maestras puedan recibir el pago de su pensión en el futuro cercano, disiento.

 AMPR et als. v. Sist. Retiro Maestros I, 190 DPR 77 (2014). El 7 de febrero de 2014 el Comisionado Especial presentó su informe en el cual indicó que las partes habían sometido el caso mediante declaraciones juradas de los testigos que hubiesen testificado y por prueba documental consistente en su mayoría de informes periciales de diversos profesionales. El Comisionado Especial en su informe hizo la salvedad de que no tuvo la oportunidad de evaluar el comportamiento de los testigos ni de los peritos por lo que no pudo evaluar la credibilidad de sus testimonios. Al igual que la Opinión mayoritaria, acogemos las determinaciones de hechos presentadas por el Comisionado.

 Determinación de hecho #102, Informe del Comisionado Especial, pág. 35, Caso Núm. CT-2014-0003, Pieza 4.

 Determinación de Hecho #103, id., pág. 35.

 Determinación de Hecho #105, id., pág. 35-36.

 Determinación de Hecho #106, id., pág. 36.

 Estipulación de Hecho #84, Informe del Comisionado Especial, supra, pág. 32.

 Estipulación de Hecho #86, id., pág. 32.

 Estipulación de Hecho #90, id., pág. 33.

 Art. II, Sec. 7, Const. PR, LPRA, Tomo 1. Esta cláusula proviene del Art. 2 de la Ley Jones de 1917. J. Trías Monge, Historia constitucional de Puerto Rico, Río Piedras, EDUPR, 1982, Vol. III, págs. 187.

 Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 834 (2013); Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 395 (1973).

 Trinidad Hernández et al. v. ELA et al., supra; Bayrón Toro v. Serra, 119 DPR 605, 619-620 (1987); United States Trust Co. of New York v. New Jersey, 431 US 1, 21 (1977).

 Bayrón Toro v. Serra, supra, pág. 619; Trinidad Hernández et al. v. ELA et al., supra, pág. 834.

 Bayrón Toro v. Serra, supra, pág. 620.

 Bayrón Toro v. Serra, supra; Trinidad Hernández et al. v. ELA et al., supra.

 Bayrón Toro v. Serra, supra, pág. 618.

 Íd., pág. 607-608.

 Íd., pág. 618; Trinidad Hernández et al. v. ELA et al., supra, pág. 835.

 Bayrón Toro v. Serra, supra, pág. 622.

 Íd., pág. 623.

 Trinidad Hernández et al. v. ELA et al., supra, pág. 837.

 Íd.

 Trinidad Hernández et al. v. ELA et al., supra, pág. 838; Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 45 (2010).

 Trinidad Hernández et al. v. ELA et al., supra, pág. 836.

 Opinión mayoritaria, págs. 871-872.

 Art. 3.9 de la Ley Núm. 160-2013.

 Íd.

 Art. 4.3 y Art. 5.5 de la Ley Núm. 160-2013.

 Art. 4.6 de la Ley Núm. 160-2013.

 Art. 3.11 de la Ley Núm. 160-2013.

 Íd.

 Art. 5.10 de la Ley Núm. 160-2013.

 Art. 4.4(a) de la Ley Núm. 160-2013.

 Opinión mayoritaria, pág. 877.

 Opinión actuarial sobre la nueva Ley 160-2013 Sistema de Retiro de Maestros de Puerto Rico, por José M. Pérez Díaz, pág. 2, Caso Núm. CT-2014-0002, Pieza 1.

 Íd., pág. 11.

 Notamos que este informe, Análisis de los fundamentos económicos asociados a la Ley de Reforma del Sistema de Retiro de los Maestros de Puerto Rico, es usado como referencia por uno de los peritos de la Asociación de Maestros, Jaime L. del Valle Caballero en su informe titulado Evaluación económica de posibles fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros de 30 de enero de 2014, Caso Núm. CT-2014-0003, Parte 3. Cabe señalar que del Valle Caballero no utiliza en su informe la conclusión de los economistas de que el retiro masivo produciría una erosión significativa en los fondos del Sistema de Retiro.

 Véanse: Informe Conjunto de las Comisiones de Asuntos Laborales y Sistemas de Retiro del Servicio Público y la Comisión de Hacienda y Presupuesto de la Cámara de Representante del 21 de diciembre de 2013; Informe Positivo sobre el P. de la C. 1589 de la Comisión de Hacienda y Finanzas Públicas del Senado, del 23 de diciembre de 2013, y Segundo Informe Positivo sobre el P. de la C. 1589 de la Comisión de Hacienda y Finanzas Públicas del Senado, del 23 de diciembre de 2013.

 Declaración Jurada de la Sra. Wanda G. Santiago López, págs. 4-5, Caso Núm. CT-2014-0003, Pieza 1.