Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
[T]he lawless science of our law-
That codeless myriad of precedent,
That wilderness of single instances.
—Aylmer’s Field, Alfred Lord Tennyson
*931 Hoy, una mayoría de este Tribunal, por razones que es-capan la comprensión y el alcance del Derecho, anuncia al País que la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de diciembre de 2013, no cumple con el estándar constitu-cional que recientemente aplicamos para sostener la cons-titucionalidad de la Reforma del Sistema de Retiro de Em-pleados del Estado Libre Asociado de Puerto Rico. Ley Núm. 3 de 4 de abril de 2013.
Alcanza este resultado incurriendo, sin asomo de son-rojo, en dos novedades, a saber: tergiversando y obviando en gran medida el análisis de menoscabo de obligaciones contractuales que este Tribunal hizo hace apenas unos me-ses para declarar válida la Ley de Reforma del Sistema de Retiro de Empleados del Estado Libre Asociado. Como sabe el País, ambas leyes son prácticamente idénticas, ambas pretendían atender la precariedad actuarial de ambos sis-temas a través de mecanismos de gran similitud dirigidos a solventar dicha precariedad. No hay justificación jurí-dica que valga para que la primera fuera constitucional y ésta no.
Además, la mayoría, desvanece de su retórica el viejo mantra de deferencia al Poder Legislativo con el cual validaban el cuatrienio pasado innumerables ponencias en las que rehusaban escudriñar legislación aprobada por aque-lla Asamblea Legislativa. A modo de ejemplo, basta recordar Domínguez Castro et al. v. E.L.A. I, 178 DPR 1 (2010), donde frente a un argumento igual que el de ahora sobre menoscabo de obligaciones contractuales, se validó la Ley Especial Declarando Estado de Emergencia Fiscal y Esta-bleciendo Plan Integral de Estabilización Fiscal para Sal-var el Crédito de Puerto Rico, Ley Núm. 7 de 9 de marzo de 2009 (Ley Núm. 7), que ordenaba el despido de miles de empleados públicos, luego de meramente leer la exposición de motivos de aquel estatuto.
Nadie debe llamarse a engaño. La “victoria” que hoy algunos reclamarán es un mero espejismo; y más que *932 nada, recuerda el triunfo de Pirro, rey de Epiro, sobre los romanos. El Sistema de Retiro de Maestros está en quiebra y necesita de una profunda reestructuración. La decisión de hoy meramente pospone esa medida adusta y la pospone en perjuicio de los propios maestros y cuando finalmente se tome, tendrá que ser mediante una ley más drástica que la que hoy se rechaza pues, para ese entonces, el Sistema de Retiro para Maestros (SRM) estará más insolvente, por te-ner que continuar desembolsando sus activos para cumplir con sus obligaciones. En ese momento, de haber un cambio de administración, quienes hoy aducen defender y emiten un panegírico de ordago sobre los derechos de los maestros recobrarán su memoria y retomarán el viejo discurso de deferencia a la Asamblea Legislativa.
Por entender que las medidas aprobadas mediante la Ley Núm. 160 de 24 de diciembre de 2013, al igual que las medidas adoptadas por la Ley Núm. 3 de 4 de abril de 2013, son necesarias y razonables para garantizar la sol-vencia actuarial del Sistema de Retiro para Maestros y que las partes demandantes no lograron probar que existían medidas menos onerosas para alcanzar ese fin, disiento. En consideración de la deferencia que constantemente le hemos reconocido a la Legislatura en circunstancias simi-lares, este Tribunal debió reconocer la constitucionalidad de la Reforma al Sistema de Retiro para Maestros, en lu-gar de convertirse en una supralegislatura y echar a un lado los principios más básicos de nuestro sistema republi-cano de gobierno y la doctrina de separación de poderes.
I
A continuación, procedo a repasar los hechos que dan origen a la controversia ante nuestra consideración.
El 24 de diciembre de 2013, la Asamblea Legislativa aprobó la Ley del Sistema de Retiro para Maestros del Es-tado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de diciembre de 2013 (Ley Núm. 160). El 8 de enero de 2014, *933 la Asociación de Maestros de Puerto Rico (Asociación), por sí y en representación de sus miembros, presentó ante el Tribunal de Primera Instancia una demanda sobre injunction preliminar y permanente, y una solicitud de sentencia declaratoria contra el Estado Libre Asociado de Puerto Rico y el Sistema de Retiro para Maestros de Puerto Rico (SRM), solicitando que se declare inconstitucional la Ley Núm. 160. El Tribunal de Primera Instanció citó a las par-tes a una vista para atender la procedencia del injunction preliminar el 27 de enero de 2014. Posteriormente, Educa-dores Puertorriqueños en Acción, Inc. y la Organización de Directores y Administradores Escolares de Puerto Rico (ODAE) solicitaron intervenir en el pleito.
El 14 de enero de 2014, la Asociación presentó ante el Tribunal Supremo de Puerto Rico una Solicitud de Certifi-cación Intrajurisdiccional, solicitando nuestra intervención directa e inmediata en el pleito ante el Tribunal de Pri-mera Instancia, pues versa sobre una cuestión novel de derecho y es una controversia de alto interés público. La Asociación también presentó una Moción en Auxilio de Ju-risdicción solicitando que paralizáramos los efectos de la Ley Núm. 160 hasta que se atendieran sus reclamos en los méritos.
Mediante una resolución dictada en esa misma fecha, declaramos “ha lugar” a ambas solicitudes. Además, en vir-tud de la Regla 51 del Reglamento del Tribunal Supremo, 4 LPRAAp. XXI-B, nombramos al Hon. Ángel Pagán Ocasio como Comisionado Especial para que recibiera la prueba de las partes y emitiera las correspondientes determinacio-nes de hecho en un informe especial a rendirse no más tarde del 7 de febrero de 2014.
El 17 de enero de 2014, el Estado y el SRM presentaron una Urgente Moción de Reconsideración ante nosotros con el fin de que dejáramos sin efecto nuestra Resolución de 14 de enero de 2014 que había ordenado la paralización de los efectos de la Ley Núm. 160. Razonaron que el remedio con-cedido por este Tribunal no cumplió con los requisitos para *934 la concesión de un injunction preliminar, pues no se cele-bró vista evidenciaria alguna antes que se concediera el injunction preliminar solicitado.
Por su parte, el 21 de enero de 2014, Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. (EDUCAMOS) también instó ante el Tribunal de Primera Instancia una demanda de injunction pre-liminar y permanente, y de sentencia declaratoria impug-nando la constitucionalidad de la Ley Núm. 160. Al día siguiente, el 22 de enero de 2014, EDUCAMOS presentó ante el Tribunal Supremo una Petición de Certificación y lina Urgente Moción de Consolidación, solicitando que cer-tificáramos su pleito ante el Tribunal de Primera Instancia y lo consolidáramos con el pleito presentado por la Asociación.
El 23 de enero de 2014, a la vez que se celebraba la conferencia con antelación a la vista evidenciaria que se-ñaló el Comisionado Especial, la Asociación y las partes interventoras presentaron ante este Tribunal una moción para que concediéramos una prórroga para la fecha de en-trega del informe del Comisionado. Fundamentaron su so-licitud en que, ante la complejidad de la controversia y el tiempo que tomaría preparar los estudios actuariales, les sería imposible prepararse adecuadamente. No obstante, mientras este Tribunal evaluaba la petición de la Asocia-ción, en la vista celebrada ante el Comisionado Especial, las partes acordaron estipular todos los hechos materiales del caso y sólo desfilar prueba documental. Esto, debido a que el pleito versa sobre una controversia esencialmente de derecho, por lo que no sería necesario celebrar una vista evidenciaria. Informe del Comisionado Especial, pág. 2, Caso Núm. CT-2014-0003, Pieza 4. El Comisionado acogió lo acordado entre las partes y señaló la continuación de la vista evidenciaria para el 29 de enero de 2014.
Mientras continuaban los procesos ante el Comisionado Especial, el 27 de enero de 2014, este Tribunal emitió una resolución en la que declaró “con lugar” la solicitud de con- *935 solidación de EDUCAMOS y denegó la moción de reconsi-deración presentada por el Estado y el SRM. Por otro lado, solicitó al Comisionado Especial que nos informara cuánto tiempo adicional necesitaba para realizar su encomienda.
Posteriormente, mediante una Comparecencia Especial del 30 de enero de 2014, el Comisionado Especial nos in-formó que no necesitaba tiempo adicional alguno para pre-parar su informe. Durante la vista del 29 de enero, las partes acordaron presentar una estipulación de hechos, lo que haría innecesaria la celebración de la vista evidenciaría. Finalmente, el Comisionado rindió su In-forme el 7 de febrero de 2014.
Luego de que las partes presentaran varios escritos so-bre los términos que tendrían para presentar sus objecio-nes al Informe del Comisionado Especial y sus respectivos alegatos, establecimos un calendario mediante una Resolu-ción dictada el 11 de febrero de 2014. Concedimos a las partes hasta el 21 de febrero de 2014 para presentar sus comentarios y objeciones al Informe, y hasta el 3 de marzo de 2014 para presentar sus alegatos de forma simultánea.
Después de recibir las objeciones y comentarios al In-forme del Comisionado Especial, y los alegatos de todas las partes, el 6 de marzo de 2014, sin que parte alguna lo so-licitara, decretamos una Resolución ordenando la celebra-ción de una vista oral el 26 de marzo de 2014. Esta vista se celebró según ordenada.
En síntesis, en sus respectivos alegatos, las partes de-mandantes sostienen que la Ley Núm. 160 es inconstitu-cional porque violenta la prohibición constitucional contra el menoscabo de obligaciones contractuales. Esto, pues el Estado no demostró que los menoscabos contractuales le-gislados eran razonables y necesarios para lograr la sol-vencia del SRM, y no consideró alternativas menos onerosas. Asimismo, alegan que la Ley Núm. 160 viola el debido proceso de ley y la igual protección de las leyes —Art. II, Sec. 7, Const. PR, LPRA, Tomo 1 — , la separación de poderes, la dignidad del ser humano —Art. II, Sec. 1, *936 Const. PR, LPRA, Tomo 1— y el Art. VI, Sec. 10 de la Constitución de Puerto Rico, LPRA, Tomo 1. Por último, indican que la acción del Estado constituyó una expropia-ción forzosa y un enriquecimiento injusto.
Por su parte, el Estado Libre Asociado y el SRM sostie-nen que las medidas adoptadas en la Ley Núm. 160 son razonables y necesarias para adelantar el interés público de garantizar la solvencia del Sistema de Retiro de Maestros de Puerto Rico y atajar la crisis fiscal que enfrenta Puerto Rico.
Finalmente, a más de tres meses de que se presentara la demanda inicial ante el Tribunal de Primera Instancia y tras un procedimiento sumamente ineficiente para un tribunal colegiado como el nuestro, cinco Jueces de esta Curia proceden a resolver esta controversia.
II
Previo a analizar los méritos de la controversia ante nuestra consideración, precisa realizar varios señala-mientos.
Llama la atención el asunto de umbral que atiende la mayoría en la ponencia que hoy anuncia. Pone de mani-fiesto el error de derecho sustantivo en que incurrió la ma-yoría cuando declaró inconstitucional mediante una reso-lución varios artículos de la Ley Núm. 18 de 15 de mayo de 2013 (Ley Núm. 18), legislación que enmendaba las Reglas de Procedimiento Civil con el fin de limitar la competencia de este Foro para atender recursos de certificación intraju-risdiccional, entre otros recursos.
En aquel entonces, advertimos a la mayoría que su pro-ceder era a todas luces improcedente. Según sostuvimos en nuestro disenso es evidente la improcedencia de una declaración de inconstitucionalidad a través de una resolución. Advertimos lo innegable: una resolución de este Tribunal no genera precedente y sólo es vinculante para las partes en el pleito en que se emita. Alvarado Pacheco y otros v. *937 ELA, 188 DPR 594, 688 (2013) (Rodríguez Rodríguez, J., Voto particular disidente). En esa ocasión, enfatizamos que era la primera vez que una determinación de esa índole ocurría en nuestra historia constitucional. íd., pág. 689.
Hoy, conscientes del error manifiesto entonces cometido, con una pizca de ironía y amplificando su anomalía jurí-dica, la mayoría adopta los pronunciamientos que en el pasado realizó incorrectamente mediante resolución. Me-diante la ponencia que hoy se anuncia, intentan impartirle la vinculación jurídica que caracteriza a las opiniones de este Foro.
Por otro lado, según he venido señalando, el trépido trá-mite con el que una mayoría ha manejado este litigio sus-cita, como mínimo, serias suspicacias. Particularmente ante las consecuencias de esta controversia en la situación fiscal y política del País. Para muestra, compárese el trámite seguido en este caso con el trámite seguido por este Tribunal en Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 832-833 (2013), y en Brau, Linares v. ELA et als., 190 DPR 315 (2014). ¿Qué justifica las diferencias?
Discutido lo anterior, pasemos entonces a evaluar el de-recho aplicable a la controversia que nos ocupa.
III
La Constitución de Puerto Rico establece que no se aprobarán leyes que menoscaben las obligaciones contractuales. Art. II, Sec. 7, Const. PR, supra. Al igual que la disposición análoga en la Constitución federal, Art. 1, Sec. 10, Const. EE. UU., LPRA, Tomo 1, esta cláusula busca proteger la estabilidad de las relaciones contractuales. Trinidad Hernández et al., supra, pág. 834; Domínguez Castro, supra, pág. 81; Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 395 (1973). No obstante, en el pasado hemos señalado que esta prohibición no es abso-luta, por lo que no todo menoscabo contractual es inconstitucional. Bayrón Toro v. Serra, 119 DPR 605, 619 *938 (1987). La prohibición constitucional contra el menoscabo de obligaciones contractuales debe armonizarse con el poder de razón de estado, el cual permite al soberano legislar y reglamentar en beneficio del interés público. Trinidad Hernández et al., supra, pág. 834, citando a U.S. Trust Co. of New York v. New Jersey, 431 US 1, 21 (1977) y Warner Lambert Co., supra, pág. 394.
Al evaluar la validez de un estatuto a la luz de esta cláusula constitucional, los tribunales deben aplicar un criterio de razonabilidad. Warner Lambert Co., supra, pág. 395. Habida cuenta que esta cláusula protege tanto las obligaciones contractuales entre sujetos privados como las contraídas por el Estado con particulares, cuando el Estado pretende menoscabar sus propias obligaciones contractuales, el escrutinio aplicable debe ser más cuidadoso, evitando que el Estado actúe exclusivamente en beneficio propio. Trinidad Hernández et al., supra, pág. 835; Domínguez Castro, supra, pág. 80; Bayrón Toro, supra, pág. 620; U.S. Trust Co. of New York, supra, págs. 25-26.
Cuando se evalúa la validez de un menoscabo de las obligaciones contractuales del propio Estado, el tribunal debe establecer un balance razonable entre el intento legislativo de promover el bien común y la protección constitucional de las obligaciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. Warner Lambert Co., supra, pág. 395. Por lo tanto, este Tribunal ha adop-tado un escrutinio con miras a establecer un balance entre el interés público que persigue dicha legislación y la con-fianza que han depositado los particulares sobre las obli-gaciones contractuales contraídas con el Estado. Id.
En la primera etapa del escrutinio, el tribunal debe determinar si existe una obligación contractual, si la legislación menoscaba esa obligación y cuál es la magnitud de ese efecto. Trinidad Hernández et al., supra, pág. 834. Por ello, debe auscultar si de hecho existe una obligación contractual entre los particulares y el Estado. Id.; Domínguez Castro, supra, pág. 80; Warner Lambert Co., supra, pág. 395. *939 Luego, debe examinar si la legislación impugnada modifica la obligación de forma tal que, en efecto, constituya un menoscabo de la obligación contractual. Bayrón Toro, supra, págs. 620-621. Finalmente, debe evaluar si el menoscabo es uno severo o sustancial. Domínguez Castro, supra, pág. 80; Bayrón Toro, supra, pág. 621; Warner Lambert Co., supra, pág. 395.
Un menoscabo contractual será considerado sustancial cuando frustre adversamente las expectativas de una de las partes. Trinidad Hernández et al., supra; U.S. Trust Co. of New York, supra; Warner Lambert Co., supra. Esto ocurre cuando el estatuto impugnado “[modifica o] afecta adversamente los términos o condiciones esenciales del con-trato que principalmente dieron motivo a la celebración de éste de modo que se frustren las expectativas razonables de las partes”. Domínguez Castro, supra, pág. 83.
Una vez se determine que la legislación impugnada constituye un menoscabo sustancial de una obligación contractual, el menoscabo será válido si la modificación es razonable y necesaria para adelantar el interés público que persigue. Domínguez Castro, supra, pág. 84. “En fin, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público, se sostendrá su validez”. Trinidad Hernández et al., supra, pág. 835, citando a U.S. Trust Co. of New York, supra, pág. 29.
En específico, hemos sostenido que la modificación será razonable si la “interferencia gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de dicho objetivo”. Trinidad Hernández et al., supra, págs. 834-835, citando a Domínguez Castro, supra, pág. 80, y Warner Lambert Co., supra, pág. 395. Es decir, para que la modificación se considere razonable, el menoscabo legislado debe guardar una relación racional con el fin que persigue. No obstante, además de ser razonable, las medidas adoptadas deben ser necesarias para adelantar el propósito gubernamental importante. Domín- *940 guez Castro, supra, pág. 84, citando a Bayrón Toro, supra, pág. 620, y U.S. Trust Co. of New York, supra, pág. 29. Las modificaciones serán consideradas necesarias si no podían realizarse modificaciones menos drásticas y no existían alternativas menos onerosas para lograr el mismo objetivo. U.S. Trust Co. of New York, supra, págs. 29-30.
Cónsono con nuestro sistema republicano de gobierno, donde las tres ramas estamos obligadas a respetar nuestras respectivas funciones —Art. I, Sec. 2, Const. PR, LPRA, Tomo 1; Trinidad Hernández et al., supra, pág. 838—, este Tribunal ha sido consecuente en otorgar cierta deferencia a la determinación que realice la Asamblea Legislativa sobre la razonabilidad y necesidad de los menos-cabos que ha legislado. Trinidad Hernández et al., supra, pág. 838; Domínguez Castro, supra, pág. 85. “La determinación de la Asamblea Legislativa en torno a [la razonabilidad y necesidad de] las medidas aprobadas constituye un ejercicio de política pública que merece nuestra deferencia en este sistema de separación de poderes”. Trinidad Her-nández et al., supra, pág. 838. No obstante, esta deferencia de ninguna forma es absoluta. Trinidad Hernández et al., supra, pág. 836, citando a Domínguez Castro, supra, pág. 85, y a U.S. Trust Co. of New York, supra, págs. 25-26.
El que sólo se le otorgue cierta deferencia en vez de una deferencia absoluta a la determinación legislativa sobre la necesidad y razonabilidad de las medidas adoptadas no implica que los tribunales realizarán un juicio de novo sobre si las alternativas disponibles servirían de mejor forma el interés público de la legislación. Trinidad Hernández et al., supra, pág. 838; Domínguez Castro, supra, pág. 85; Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 370 (2do Cir. 2006). La cláusula contra el menoscabo de obligaciones contractuales no exige que los tribunales sirvan como su-pralegislaturas, evaluando por su cuenta cuáles de las alternativas disponibles a la Asamblea Legislativa era la más apropiada. Baltimore Teachers Union v. Mayor and City Council of Baltimore, 6 F.3d 1012, 1021—1022 (4to Cir. *941 1993), citado con aprobación en Domínguez Castro, supra, pág. 85. Nuestra responsabilidad como Tribunal no es evaluar si la legislatura podía adoptar otras medidas, como desviar fondos de servicios esenciales del gobierno o au-mentar los impuestos. Nuestra responsabilidad es evaluar si las medidas adoptadas cumplen con el escrutinio aplicable al menoscabo de obligaciones contractuales del propio Estado. De esta forma, velamos por que el Estado no abuse de su poder al equiparar el menoscabo de contratos con otras alternativas de política pública o imponer un menoscabo más severo del necesario para lograr el mismo propósito. Baltimore Teachers Union, supra, págs. 1019-1020, citando a U.S. Trust Co. of New York, supra, págs. 30-31.
Conforme a la deferencia que debemos a la determinación de razonabilidad y necesidad que realizó la legislatura, el menoscabo de la obligación contractual no se sostendrá si la parte demandante demuestra que existen alternativas menos onerosas a las que el legislador escogió para lograr el interés público que persigue el estatuto. Trinidad Hernández et al., supra, pág. 837; Domínguez Castro, supra, pág. 84. No será suficiente que la parte demandante meramente alegue de forma generalizada que existen alternativas menos onerosas, sino que debe detallar cómo éstas se implementarían y lograrían el mismo propósito de la legislación que impugnan. Trinidad Her-nández et al., supra, págs. 837-838. Particularmente, deben presentar evidencia suficiente como para convencer al tribunal que estas alternativas son viables y menos onerosas. Trinidad Hernández et al., supra, pág. 838.
En Bayrón Toro v. Serra, supra, tuvimos la oportunidad de evaluar la razonabilidad de unos cambios al Sistema de Retiro de Empleados de la Universidad de Puerto Rico aprobados por el Consejo de Educación Superior. Las en-miendas realizadas variaron las condiciones y requisitos para participar en el Sistema de Retiro de la UPR, a saber: los años de servicio requeridos para acogerse al retiro, la *942 cuantía de las aportaciones que realiza el participante al fondo y la edad necesaria para acogerse a los beneficios del retiro. Al evaluar las enmiendas, encontramos que éstas menoscabaron la obligación contractual del Estado con los participantes pues
[...] los participantes de un Sistema de Retiro del Gobierno tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema [...] Una vez el empleado se ha retirado, cuando ha cumplido con todas las condiciones para el retiro, su pensión no está sujeta a cambios o menoscabos. Sin embargo, antes de que pueda acogerse a la jubilación, los términos del sistema de retiro pueden ser en-mendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar la solvencia actuarial del mismo. Id., pág. 618.
Por ser parte esencial del contrato de empleo que aceptaron al ingresar en el servicio público, los cambios a los términos y condiciones del plan de retiro que analizamos en Bayrón Toro frustraron las expectativas de los demandantes y constituyeron un menoscabo sustancial de las obligaciones contractuales del Estado. íd., pág. 617. Sin embargo, a la luz de las circunstancias del caso, sostuvi-mos la validez de los cambios por éstos ser razonables y necesarios para garantizar la solvencia actuarial del Sistema de Retiro. íd., pág. 623. Al momento de adoptar las enmiendas, el Sistema de Retiro
[...] se encontraba ante una grave crisis actuarial, que ponía al sistema en peligro de tener que liquidar sus activos. En un informe rendido por los actuarios se señala que los desembol-sos del fondo aumentaron a un nivel mayor que los ingresos y se señala como causa principal para la deficiencia actuarial la jubilación de participantes a temprana edad. (Citas omitidas), íd., pág. 622.
Por lo tanto, reconocimos que
el Estado debe tener la capacidad y la flexibilidad para hacer cambios y enmiendas razonables que sean necesarias para adelantar los intereses del Sistema de Retiro y fortalecerlo tanto en sus cimientos como en sus estructuras. Variaciones *943 en condiciones y requisitos tales como años de servicio, apor-taciones al fondo y edad para recibir los beneficios son esen-ciales para mantener el fondo en estado solvente. Esta flexibi-lidad es vital para que el Sistema de Retiro pueda enfrentarse a situaciones inesperadas y para que pueda también mante-nerse a la par con avances en las ciencias actuariales. Recono-cerle al Estado la facultad de adoptar modificaciones en los sistemas de retiro dentro de los parámetros aquí expresados, es indispensable para que estos planes puedan operar exitosamente. íd., pág. 623.
En fin, concluimos que no existía un menoscabo indebido de las obligaciones contractuales porque los menoscabos contractuales eran razonables y necesarios para salvar la solvencia misma del sistema de retiro, según las circunstancias del caso. Bayrón Toro, supra, pág. 623.
Recientemente, en Trinidad Hernández et al., supra, validamos la Reforma del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, Ley Núm. 3 de 4 de abril de 2013. Esta ley no sólo menos-cabó las condiciones y requisitos para participar en el Sis-tema, sino que también congeló los beneficios acumulados bajo un plan de beneficio definido y movió a los empleados a un plan de contribución definida. Trinidad Hernández et al., supra, pág. 832. A diferencia de las modificaciones que evaluamos en Bayrón Toro, donde los cambios sólo afectaban los requisitos y las condiciones para acogerse al retiro, en Trinidad Hernández et al. los cambios afectaban los beneficios de la pensión en sí. Al evaluar estas modificaciones a la luz del criterio de razonabilidad aplicable cuando el Estado intenta menoscabar sus propias obligaciones contractuales, determinamos que según se desprendía de la Exposición de Motivos de la Reforma del Sistema de Retiro,
[...] las medidas adoptadas [eran] necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema. Ello cier-tamente constituye un interés público importante pues, al ga-rantizar la solvencia económica del sistema, se beneficia a to-dos sus participantes y se atiende, en parte, la crisis fiscal que *944 enfrenta el País en protección del bienestar de todos los puertorriqueños. íd., pág. 837.
Consecuentes con lo resuelto en Domínguez Castro, le otorgamos cierta “deferencia [...] a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad del estatuto”. Trinidad Hernández et al., supra, pág. 836, citando a Domínguez Castro, supra, pág. 85. En fin, sostuvimos la validez de las enmiendas porque, según se desprendía de la Exposición de Motivos de la Ley Núm. 3, el Estado demostró su razonabilidad y necesidad, y la parte demandante no demostró que existían alternativas menos drásticas o severas a las seleccionadas por el legis-lador para garantizar la solvencia del Sistema de Retiro. Los demandantes simplemente alegaron de forma genera-lizada que existían alternativas menos onerosas, sin deta-llar cómo se realizarían y cómo lograrían garantizar la sol-vencia del sistema de retiro. Trinidad Hernández et al., supra, págs. 837-838.
IV
En este caso, las partes han estipulado que existe una obligación contractual entre los demandantes y el Estado que es menoscabada sustancialmente por la Ley Núm. 160, pues afecta adversamente las expectativas de por lo menos uno de los demandantes respecto a su retiro. Informe del Comisionado Especial, pág. 32, Caso Núm. CT-2014-0003, Pieza 4. Por lo tanto, conforme al análisis anteriormente reseñado, sólo nos resta por determinar si el menoscabo legislado en la Ley Núm. 160 es razonable y necesario a la luz del interés público que persigue: garantizar la subsis-tencia y solvencia del SRM, y la salud económica del País. Exposición de Motivos de la Ley Núm. 160 de 24 de diciem-bre de 2013, pág. 18. Para ello, primero debemos conside-rar el contexto del SRM y las deficiencias que esta legisla-ción pretende remediar. Veamos.
*945 Una lectura del Informe del Comisionado nombrado por una mayoría de este Tribunal denota que estamos ante un Sistema de Retiro de Maestros (SRM) “moribundo” —Informe del Comisionado Especial, supra, pág. 35— “que amerita atención inmediata”. íd., pág. 37. Este Sistema “atraviesa una crisis financiera que amenaza con dejarlo sin fondos suficientes para cumplir con sus obligaciones, actuales y futuras [hacia todos sus participantes]”. Exposición de Motivos de la Ley Núm. 160, pág. 1.
Actualmente, el SRM cuenta con un déficit actuarial de más de diez mil millones de dólares ($10,251,273,000). In-forme del Comisionado Especial, supra, pág. 36. Esto fi-gura una cobertura actuarial de apenas un diecisiete por ciento (17%). Declaración Jurada de la Hon. Melba Acosta Febo, pág. 4, Caso Núm. CT-2014-0003, Pieza 1. Es decir, por cada dólar que el SRM está obligado a desembolsar, sólo posee diecisiete centavos ($0.17). íd. La cobertura actuarial promedio en planes estatales comparables es alre-dedor de setenta por ciento (70%) y el plan de retiro estatal con la próxima cobertura actuarial más deficiente es la del sistema de Illinois con una cobertura de treinta y cuatro por ciento (34%) o el doble de la cobertura del SRM. Expo-sición de Motivos de la Ley Núm. 160, pág. 2. Véase, ade-más, Moción en cumplimiento de orden de las partes recu-rridas, Informe pericial del actuario Glen Bowen, pág. 1, Caso Núm. CT-2014-0002, Pieza 2.
Para el año fiscal 2013-2014, se proyecta que el SRM tendrá una deficiencia en el flujo de efectivo en caja de $322 millones. Informe del Comisionado Especial, supra, pág. 33. Entre el 2015 y el 2023, esta deficiencia anual fluctuará entre los $317 y $362 millones de dólares. íd. Para cubrir esta deficiencia y cumplir con el pago de sus obligaciones hacia sus participantes, el SRM estaría obli-gado a vender sus activos de forma que pueda compensar por su déficit actuarial y cumplir con todas sus obliga-ciones. Informe del Comisionado Especial, supra, pág. 35. *946 Esto ya ha ocurrido, pues en el 2013 el SRM tuvo que re-currir a la venta de activos para cubrir sus obligaciones para el semestre. Declaración Jurada Melba Acosta Febo, supra, pág. 6. De continuar en esta trayectoria, se estima que para el 2020 el Sistema de Retiro de Maestros agotará todos sus activos y no contará con fondos suficientes para cubrir el pago de sus obligaciones, incluyendo el pago de las pensiones de los maestros ya retirados. Informe del Co-misionado Especial, supra, pág. 35; Declaración Jurada Melba Acosta Febo, supra, pág. 6; Exposición de Motivos de la Ley Núm. 160, pág. 8.
Una vez el SRM no cuente con más activos para vender, entre el 2021 y el 2023 el Estado Libre Asociado estaría obligado a inyectar anualmente entre $317 y $363 millones adicionales a los que ya aporta como patrono al SRM. In-forme del Comisionado Especial, supra, pág. 32. A partir del 2020, el Fondo General de Puerto Rico tendría que aportar al SRM un promedio anual de $562 millones al año, una porción considerable del déficit proyectado de $820 para el término 2013-2014. Declaración Jurada Melba Acosta Febo, supra, pág. 7. Este impacto sobre el fisco puertorriqueño sería equivalente al impacto que hu-biese tenido el Sistema de Retiro de Empleados del Estado Libre Asociado de no haberse aprobado la reforma de la Ley 3. Declaración Jurada Melba Acosta Febo, supra, pág. 8. “Esto claramente afectaría las operaciones del gobierno y tendría consecuencias nefastas incluyendo despidos y re-ducción de jornada laboral”. Id., pág.4. Requeriría “recortes drásticos en los servicios gubernamentales de seguridad, salud y educación, incluyendo recortes adicionales de personal, además de aquellos ajustes que tenga que hacer [el gobierno] para reducir el déficit de $820 millones que toda-vía carga el Fondo General”. Exposición de Motivos de la Ley Núm. 160, pág. 8.
Ante este panorama desolador, la Asamblea Legislativa aprobó la Ley del Sistema de Retiro para Maestros del Es-tado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de *947 diciembre de 2013. Según se desprende de la Exposición de Motivos de la Ley, este estatuto es “un plan de reforma integral para atender el déficit actuarial del Sistema”. Ex-posición de Motivos de la Ley Núm. 160, pág. 12. Las en-miendas al SRM tienen el propósito de reducir significati-vamente “tanto el déficit actuarial del Sistema como el déficit de caja que sufre el mismo y que amenaza con de-jarlo sin activos en un futuro cercano”. íd., pág. 13.
Sin duda, como bien han estipulado las partes, para atender la crisis estructural del Sistema esta medida ha resultado en un menoscabo sustancial a las obligaciones contractuales de los participantes. Informe del Comisio-nado Especial, supra, pág. 32. Ahora bien, para efectos del escrutinio aplicable debemos precisar en qué consiste este menoscabo para poder evaluar su razonabilidad y necesidad.
Para garantizar la solvencia del SRM y el pago de las pensiones de los participantes ya retirados y los todavía activos, la Ley Núm. 160 contiene las medidas siguientes:
(1) la congelación de la acumulación de beneficios de partici-pantes actuales bajo la Ley 91, eliminando la acumulación de nuevos beneficios bajo el plan de beneficios definidos actual, pero respetando toda acumulación ganada por dichos partici-pantes hasta el presente; (2) el traslado de los miembros acti-vos bajo la Ley 91 a un plan de aportación definida con un beneficio mínimo garantizado para los participantes activos al 31 de julio de 2014; (3) la eliminación prospectiva de la pen-sión por mérito; (4) el incremento en la edad de retiro para futuros maestros; (5) el incremento en la aportación de los participantes al Sistema; (6) el incremento de la aportación patronal, adicional al incremento ya legislado mediante la Ley 114-2011; (7) la modificación de los beneficios otorgados por las Leyes Especiales para los participantes retirados y la eli-minación de dichos beneficios de forma prospectiva; y (8) la modificación de los beneficios de incapacidad y de los benefi-ciarios de participantes. Exposición de Motivos de Ley Núm. 160, pág. 13.
Esto es, la Ley Núm. 160 menoscaba las obligaciones del Estado en la medida en que altera los criterios y requisitos para participar en el SRM, modifica los beneficios de pen- *948 sión por retiro no acumulados y elimina los beneficios de las leyes especiales. Todo esto correlativo a aportaciones adicionales que realizará el Fondo General de Puerto Rico mediante una Aportación Uniforme para la Justicia Magisterial y una Aportación Adicional Anual. Estas aportacio-nes significan un aumento en lo que actualmente aporta el Estado Libre Asociado de Puerto Rico como patrono al SRM. Exposición de Motivos de la Ley Núm. 160, pág. 13.
Habiendo definido en qué consiste el menoscabo que de-bemos evaluar, pasemos entonces a evaluar su razonabili-dad y necesidad. Según surge de la exposición de motivos de la Ley Núm. 160, la Asamblea Legislativa entendió ne-cesario y razonable adoptar estas medidas para lograr la solvencia del SRM. Específicamente, la Asamblea Legisla-tiva expresó que
[...] estas medidas son necesarias y razonables para resolver la situación deficitaria del Sistema de Maestros, dentro de nuestro ordenamiento legal y constitucional. Son las alterna-tivas menos onerosas disponibles para lograr el fin público apremiante de: (1) evitar que el Sistema de Maestros se quede sin fondos para pagar las pensiones a nuestros retirados; (2) honrar los beneficios acumulados por los maestros retirados y por aquellos que continúan educando diariamente a nuestros niños y jóvenes; (3) reducir significativamente el impacto pro-yectado del déficit anual del Sistema en el Fondo General, lo que de no hacerse afectaría la prestación de servicios públicos esenciales a la ciudadanía; y (4) evitar la catástrofe socio-económica y fiscal que supondría la degradación del crédito de Puerto Rico al nivel de “chatarra”. Exposición de Motivos de la Ley Núm. 160, pág. 17.
Asimismo, la Hon. Melba Acosta Febo, Secretaria de Hacienda del Estado Libre Asociado de Puerto Rico, funcio-naría que a su vez tiene a su cargo la presidencia de la Junta del Sistema de Retiro de Maestros, señaló que me-diante la Ley Núm. 160
[...] se logró presentar una solución que reduce significati-vamente las necesidades de flujo de efectivo del SRM ali-viando así la presión que existe sobre el Fondo General que presenta un déficit presupuestario, mientras se asegura la es- *949 tabilidad y solvencia actuarial del sistema, (esto es, el pago de pensiones a los maestros y maestras en años venideros) [...] Declaración Jurada de la Hon. Melba Acosta Febo, supra, pág. 9.
Al evaluar cada uno de los menoscabos, vemos que éstos están dirigidos a atender directamente los problemas es-tructurales del SRM y su déficit de flujo de efectivo para así garantizar su solvencia. Por tal razón, los menoscabos legislados —los cambios a los requisitos y condiciones de elegibilidad, los cambios a los beneficios por pensión, y la eliminación de los beneficios de las leyes especiales— son razonables, pues guardan una relación racional con el fin de garantizar la solvencia del SRM.
Consecuentemente, resta por determinar si la parte de-mandante ha demostrado que existen alternativas menos drásticas o severas que las que el legislador escogió para lograr su objetivo. Trinidad Hernández et al., supra, pág. 837, citando a Domínguez Castro, supra, pág. 84; U.S. Trust Co. of New York, supra, págs. 29-31. Contrario a lo ocurrido en Trinidad Hernández et al., en este caso la parte demandante ha presentado varias alternativas a las medidas que adoptó la Asamblea Legislativa y ha desfilado prueba sobro cómo se podrían implementar y el impacto que tendrían sobre la solvencia actuarial del SRM. Sin embargo, “no demostraron que tienen evidencia para convencer al tribunal en un juicio que estas alternativas son via-bles y menos onerosas”. Trinidad Hernández et al., supra, pág. 838.
Algunas de las medidas que proponen los demandantes son precisamente alternativas que ya forman parte de la Ley Núm. 160, luego de ser recibidas y estudiadas en re-uniones con los gremios magisteriales. Estas son: la reduc-ción de diez por ciento (10%) de los gastos administrativos del Departamento de Educación y del SRM; el pago de la deuda de $24 millones que los demandantes alegan tiene el Departamento de Educación como patrono con el SRM; la eliminación de las pensiones privilegiadas; y nombrar to- *950 das las plazas de maestros vacantes. Exposición de Moti-vos de la Ley Núm. 160, pág. 11.
En cuanto a las demás alternativas esbozadas por los demandantes, al momento de aprobar la Ley Núm. 160, el Estado las consideró y las descartó por ser insuficientes para lograr la solvencia actuarial del SRM o no ser viables. Exposición de Motivos de la Ley Núm. 160, pág. 12. Más allá, la Secretaria de Hacienda testificó mediante declara-ción jurada que
lamentablemente, debido a la magnitud del problema, en-tendemos que no existe ninguna otra posibilidad para que el SRM mantenga los derechos de pensión que existen hoy en día, siendo la única posibilidad para garantizar la solvencia del SRM la reforma contenida en la Ley 160-2013. [...]
........
Como parte del proceso de aprobación de la Ley 160-2013, hubo varias reuniones con grupos magisteriales para traer propuestas para no reformar el sistema. Recibí y fui consul-tada de las propuestas que fueron presentadas por estos grupos. Ninguna de ellas resuelve el problema de $10 billones del sistema. O no son viables, o simplemente son muy tímidas. Igual ocurre con diversos proyectos de ley a los que, aunque sometidos, no se les ha podido dar curso, porque no son viables y/o no logran la solvencia actuarial del SRM. Declaración Ju-rada de la Hon. Melba Acosta Febo, supra, págs. 12-13.
Las expresiones de la Secretaria de Hacienda demues-tran que el Estado evaluó las diferentes alternativas a su disposición, incluyendo las propuestas por la parte deman-dante, y luego de estudiarlas concluyó que no eran viables o suficientes para lograr el propósito de la Ley Núm. 160: garantizar la solvencia actuarial del SRM y atender a su vez la crisis fiscal del país. Sin reparo alguno, debemos concluir que la parte demandante no ha demostrado que existían otras alternativas menos onerosas que lograrían la solvencia del SRM, razón por la cual no podemos apar-tarnos de nuestra doctrina jurisprudencial y prescindir de la deferencia que en ocasiones similares hemos extendido a la Asamblea Legislativa. Por todo lo anterior, la Ley Núm. 160 constituye un menoscabo contractual permisible, pues *951 es una medida necesaria y razonable para garantizar la solvencia del SRM.
A
Por el contrario, hoy una mayoría de este Tribunal usurpa las funciones del legislador al sostener que las me-didas de política pública que el Poder Legislativo adoptó para atender la crisis actuarial del Sistema de Retiro de Maestros son irrazonables, pues no van dirigidas a solven-tar la crisis actuarial del sistema y, en cambio, ponen al Sistema en peor situación. Tal determinación es incon-gruente con nuestros pronunciamientos anteriores sobre la cláusula contra menoscabos contractuales en el contexto de los planes de retiro de los empleados públicos. Veamos.
La Opinión mayoritaria concluye que “[lluego de evaluar con detenimiento la prueba admitida, es insoslayable concluir que para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, la Ley Núm. 160-2013 es irrazonable, y por consiguiente, in-constitucional [...]”. Opinión mayoritaria, pág. 871. Funda-menta su conclusión en que “los demandantes en este caso presentaron evidencia que demuestra que las medidas adoptadas no garantizan la solvencia económica del SRM, requisito de umbral conforme con nuestra jurisprudencia. El Estado no presentó prueba que refutara esa conclusión”. (Citas omitidas). Opinión mayoritaria, pág. 877. Sin pro-fundizar de forma alguna en por qué en este caso no debe-mos otorgarle la misma deferencia que le reconocimos a la determinación de la Asamblea Legislativa sobre la razona-bilidad y necesidad de las medidas adoptadas en Trinidad Hernández et al. y Domínguez Castro, la opinión mayoritaria simplemente hecha a un lado la determinación de la legislatura al respecto.
Concluye que el Estado “no pudo refutar la prueba pre-sentada por los maestros” sobre cómo el supuesto retiro masivo que impulsa la Ley Núm. 160 tendría un efecto *952 devastador sobre la solvencia del SRM. Opinión mayoritaria, pág. 873. De esta forma, la decisión mayoritaria impone al Estado el peso de demostrar la razonabilidad y necesidad de las medidas que ha adoptado, aplicándole un estándar de prueba inarticulado e ininteligible y revocando sin más explicaciones lo resuelto por este Tribunal en Trinidad Hernández et al., Domínguez Castro y Bayrón Toro.
La mayoría del Tribunal sostiene que la prueba pericial presentada por los demandantes demostró que la Ley Núm. 160 no promueve la solvencia del SRM. No estoy de acuerdo con prescindir de la deferencia que debemos otor-gar a la Asamblea Legislativa al amparo de esta prueba pericial, pues tiene escaso o ningún valor probatorio. En primer lugar, la mayoría fundamenta sus conclusiones en estos informes sin expresarse sobre la admisibilidad y re-levancia de los mismos. Recordemos que, contrario al pro-cedimiento que exige la Regla 51 de nuestro Reglamento, supra, el Comisionado Especial no realizó determinación alguna sobre la admisibilidad de la prueba documental presentada por las partes:
Las partes estipularon que presentarían el testimonio de los testigos, [sic.] mediante declaraciones juradas. Lo que significa, según estipulación, que de haberse sentado a declarar dichos testigos, el contenido de su declaración jurada es lo que en efecto hubiesen declarado; todo ello sin perjuicio de las objeciones y de la admisibilidad y relevancia que cada parte pueda tener. (Énfasis suplido). Informe del Comisionado Especial, supra, pág. 38 esc. 12.
Adicionalmente, el Comisionado Especial nos indica que
[r]esulta menester pormenorizar que el Comisionado Especial no tuvo la oportunidad de evaluar el “demeanor” o com-portamiento de los testigos ni de los peritos en la silla testifical, ni evaluar su credibilidad mientras testificaban, ante la estipulación de todos los abogados de someter el caso me-diante declaraciones juradas. Informe del Comisionado Especial, supra, pág. 34 esc. 7.
*953 En segundo lugar, utiliza los informes de los peritos eco-nomistas de la Asociación, José I. Alameda Lozada y Alfredo González Martínez, y el informe del actuario José M. Pérez Díaz, perito de la ODAE, sin considerar las bases científicas ni los métodos utilizados para las opiniones es-bozadas en sus informes, pues estos no las revelan. Surge del informe de los economistas Alameda Lozada y González Martínez que estos entienden que es una situación impre-vista de la Ley Núm. 160 el que 7,000 maestros opten por retirarse antes de tiempo. A su vez, indican que podrían ser 10 mil o 12 mil maestros adicionales, a pesar de que no citan fuente alguna para sustentar estas proyecciones.(1)
Por su parte, el actuario Pérez Díaz se limita a señalar en su opinión actuarial lo siguiente:
El impacto de la Ley Núm. 160-2013 sobre el sistema se resume en los siguientes puntos:
........
2. Según nuestro modelo, el efecto principal sería extender la cantidad de activos del sistema hasta el año 2038, el mismo año en que el sistema comenzaría con la misma cantidad de activos que comenzó en el 2013. O sea, el sistema práctica-mente no desarrollaría activos del 2013 al 2038 dada la nece-sidad tan grande por pagar beneficios de pensiones. Luego los activos se agotarían completamente en el 2057.
........
4. En realidad esta ley le añade mucho riesgo de insolvencia al sistema porque del 2013 al 2038 pueden pasar muchos eventos negativos que abonen a la rápida insolvencia del sistema.
En el caso del impacto de los escenarios de 5,000, 10,000 y 15,000 de nuevos jubilados repentinamente tenemos lo si-guiente:
Bajo la Ley Núm. 160-2013 pasaría lo siguiente:
*954 Tabla IV
Cantidad de Jubilados Año fiscal en que se agotarían los activos del sistema
5,000 2022
10,000 2018
15,000 2016
Según los resultados en las [sic] Tabla IV, la jubilación de miembros activos repentinamente aceleraría el colapso del sis-tema trayéndolo prácticamente hasta el tiempo presente. Hace lógica este comportamiento porque según nuestros resul-tados los jubilados terminan recibiendo mucho más en benefi-cios comparado con lo que aportan al sistema en una base anual. Por lo tanto, cuando un grupo de 5,000, 10,000 o 15,000 miembros activos se jubila repentinamente la utilización de beneficios de pensiones se dispara respectivamente. (Énfasis en el original). Opinión actuarial sobre la nueva Ley 160-2013, Sistema de Retiro de Maestros de Puerto Rico de José M. Pé-rez Díaz, págs. 11-12, Caso Núm. CT-2014-0002, Pieza 1.
Esas cifras, en las cuales se basa la Opinión mayorita-ria, las computó el actuario Pérez Díaz a base de “un mo-delo financiero bastante complejo [que él desarrolló] que puede predecir cuál será el impacto de la Ley 161-2013 [...]”. Opinión Actuarial... de José M. Pérez Díaz, supra, pág. 11. No detalla en qué consiste dicho “modelo finan-ciero”. De hecho, de las doce páginas a doble espacio que conforman la referida opinión actuarial, sólo los párrafos citados son alusivos al supuesto impacto que tendría el es-peculativo retiro masivo de maestros.
Entendemos que la opinión actuarial citada tiene muy poco valor probatorio, pues no detalla las bases empíricas y fácticas que sostienen sus conclusiones. Regla 702 de Evi-dencia, 32 LPRA Ap. VI. Además, la opinión actuarial es contradictoria al reconocer que la Ley Núm. 160 prolonga la subsistencia de activos hasta el 2057 para luego aludir a “muchos eventos negativos” que podrían provocar dicha in-solvencia para el 2016, 2018 o 2022. Sin embargo, no *955 atiende ni evalúa cuál es la probabilidad de esos “muchos eventos negativos” a los que alude, por lo que su determi-nación al respecto no merece que se le adjudique valor pro-batorio alguno.
La mayoría no explica por qué las opiniones de estos peritos merecen mayor credibilidad que la prueba presen-tada por la Asamblea Legislativa, de forma tal que deba ceder la deferencia que le hemos reconocido al aplicar este escrutinio. Consideramos que las aseveraciones no funda-mentadas de la Opinión actuarial del actuario Pérez Díaz no son suficientes para rebatir la presunción de constitu-cionalidad que reviste la ley impugnada. Ni siquiera sabe-mos qué factores consideró el perito, si tomó en considera-ción el resto de las disposiciones de la Ley Núm. 160 o si analizó aisladamente el impacto de este retiro especulativo en masa.
Contrario a la contención del actuario Pérez Díaz y de las partes demandantes, el expediente demuestra que la Rama Legislativa sí tuvo ante su consideración la informa-ción necesaria para determinar cuántos participantes ha-brían de acogerse a retiro en los próximos años. El estudio actuarial preparado por Milliman para el 30 de junio de 2012 incluye varias tablas que detallan las características de los participantes activos y retirados del Sistema de Re-tiro para Maestros, incluyendo los años de edad y los años de servicio de cada uno. Informe de Milliman, págs. 38-44, Caso Núm. CT-2014-0003, Pieza 2. El hecho de que el le-gislador contó con el beneficio de esta información al mo-mento de ejercer sus prerrogativas legislativas queda de-mostrado en varias disposiciones de la Ley Núm. 160. Ahora bien, no sabemos si fueron analizadas por el doctor Pérez Díaz en su Opinión actuarial y por la parte deman-dante al aseverar que el retiro de 7,000 maestros agravaría la crisis actuarial del Sistema de Retiro para Maestros. Veamos.
El Artículo 3.9 de la Ley Núm. 160 contempla los diver-sos escenarios que pueden darse con relación a los requisi- *956 tos de edad de retiro y años de servicio. En específico, dis-pone lo siguiente:
(a) Aquellos participantes que a la fecha de efectividad de esta ley tenían derecho a retirarse y recibir algún tipo de pen-sión bajo la Ley 91-2004, según enmendada, por haber cum-plido con los requisitos de años de servicio y edad correspon-dientes, podrán retirarse en cualquier fecha posterior a la fecha de efectividad de esta ley.
(b) Aquellos participantes que al 31 de julio de 2014 tengan derecho a retirarse y recibir algún tipo de pensión bajo las disposiciones de la Ley 91-2004, según enmendada, o tengan derecho a retirarse bajo las disposiciones de esta ley por haber cumplido con los requisitos de años de servicio y edad corres-pondientes, podrán retirarse en cualquier fecha posterior al 1ro de agosto de 2014.
(c) A partir del 1ro de agosto de 2014, cualquier participante activo al 31 de julio de 2014 podrá solicitar el retiro cuando:
(1) cumpla cincuenta y cinco (55) años de edad y complete por lo menos treinta (30) años de servicio; o
(2) cumpla sesenta (60) años de edad y complete por lo me-nos cinco (5) años de servicio.
(d) Cualquier participante en servicio activo que haya ingre-sado al Sistema a partir del 1ro de agosto de 2014 podrá soli-citar el retiro cuando:
(1) cumpla sesenta y dos (62) años de edad y complete al menos cinco (5) años de servicio; y
(2) haya hecho aportaciones individuales de diez mil dóla-res ($10,000) o más. Art. 3.9 de la Ley Núm. 160, págs. 37-38.
Como puede apreciarse, este artículo reconoce los dis-tintos escenarios de retiro, de acuerdo al cumplimiento de requisitos para ello en las distintas fechas de aplicación de la ley. En primer lugar, respeta el derecho adquirido de los participantes que al 24 de diciembre de 2013, fecha de efec-tividad de la ley, ya cumplían con los requisitos para reti-rarse con alguna pensión al amparo de la Ley Núm. 91 de 29 de marzo de 2004 (Ley Núm. 91), 18 LPRA see. 391 et seq. Incluso, dispone que estos participantes podrán reti-rarse en cualquier momento posterior a la efectividad de la ley sin que su pensión se vea afectada. Siendo así, sería infundada la aseveración de que la Ley Núm. 160 propicia el retiro repentino y temprano de estos participantes, por su temor a quedar en peor posición. Después de todo, po- *957 drían decidir acogerse a retiro y recibir la pensión a la que tendrían derecho al amparo de la Ley Núm. 91.
En segundo lugar, el inciso (b) de este artículo reconoce y respeta el derecho adquirido de los participantes que al 31 de julio de 2014 tengan derecho a retirarse y recibir alguna pensión al amparo de la Ley Núm. 91 de la Ley Núm. 160. Al igual que el inciso anterior, les permite reti-rarse en cualquier fecha posterior. Consecuentemente, también sería infundada la aseveración de que la Ley Núm. 160 propicia el retiro repentino y temprano de estos participantes.
En tercer lugar, el inciso (c) del artículo citado atiende el escenario de aquellos participantes que, al 31 de julio de 2014, no cualificarán para retirarse. Naturalmente, no po-demos aseverar que la Reforma impugnada provocaría el retiro temprano de estos participantes, pues no cualifican para ello. Con la Ley Núm. 160, estos podrán retirarse cuando cumplan 55 años de edad y completen por lo menos treinta 30 años de servicio; o cumplan 60 años de edad y completen por lo menos 5 años de servicio.
El cuarto y último escenario contemplado por el Artículo 3.9 es el de aquellos participantes que ingresen al Sistema de Retiro para Maestros a partir del 1 de agosto de 2014, quienes podrán solicitar el retiro cuando cumplan 62 años de edad y 5 de servicio, y hayan hecho aportaciones indivi-duales de $10,000. Estos, lógicamente, tampoco pueden re-tirarse repentinamente.
Finalmente, el Artículo 4.4(a), titulado “Grandfather Provision”, es la única disposición que permite el retiro temprano de maestros bajo las condiciones siguientes:
Aquellos participantes que, de no haberse aprobado esta Ley, hubiesen tenido derecho a retirarse con una pensión bajo el Artículo 40(b)(1) y (b)(2) de la Ley 91-2004, según enmen-dada, por cumplir treinta (30) años de servicio acreditados en-tre el 1 de agosto de 2014 y el 30 de junio de 2016, podrá hacerlo bajo los siguientes términos:
(a) Para aquel participante que hubiera completado treinta (30) o más años de servicios acreditados durante dicho periodo *958 pero no haya cumplido cincuenta y cinco (55) o más años de edad en o antes de la efectividad de esta Ley, se le concederá el setenta por ciento (70%) del salario promedio de dicho partici-pante a la fecha de efectividad de esta ley. Para beneficiarse de esta disposición el participante estará obligado a retirarse efectivo el 31 de julio de 2014 y deberá continuar aportando al Sistema con la aportación individual establecida en el Artículo 4.4(d) de esta Ley hasta que cumpla 55 años de edad. De igual manera, el patrono deberá continuar al Sistema con la apor-tación patronal establecida en el Artículo 4.4(d) de esta ley hasta que el participante cumpla cincuenta y cinco (55) años de edad.
(b) Para aquel participante que hubiera completado treinta (30) o más años de servicios acreditados durante dicho periodo y cumplido cincuenta y cinco (55) o más años de edad en o antes de la efectividad de esta ley, se le concederá el setenta por ciento (70%) del salario promedio de dicho participante a la fecha de efectividad de esta Ley. Para beneficiarse de esta disposición el participante estará obligado a retirarse efectivo el 31 de julio de 2014.
Aquellos participantes en el servicio activo que cumplan con los requisitos para recibir una pensión bajo este artículo y de-seen acogerse a la disposición de esta sección, estarán obliga-dos a notificar dicha renuncia, final y firme, al Departamento de Educación con copia al Sistema de Retiro de Maestros en o antes del 31 de marzo de 2014. Art. 4.4(a) de la Ley Núm. 160, pág. 45.
Aunque esta disposición de la Ley Núm. 160 sí fomenta que un grupo de maestros se acoja a los beneficios de retiro hasta con dos años de anticipación, igualmente tenemos que reiterar que el legislador contó con el estudio actuarial de Milliman, del cual se puede conocer fácilmente cuántos participantes cualificarían para este retiro temprano. De hecho, la propia Opinión mayoritaria pudo detallar cuán-tos participantes se retirarían, gracias a la información en las tablas de este informe y que estuvieron disponibles para el legislador al momento de aprobar la Reforma en cuestión. No tenemos por qué inferir que la Rama Legisla-tiva no tomó el impacto de esta disposición en considera-ción.
También es meritorio destacar que la Ley Núm. 160 no afecta retroactivamente las pensiones de aquellos partici- *959 pantes que, al 31 de julio de 2014, serían elegibles para recibir alguna pensión al amparo de la Ley Núm. 91. Aque-llos que decidan mantenerse en el magisterio y posponer su retiro, mantendrán su pensión adquirida mediante la ley anterior. Así lo dispone claramente el Artículo 4.4 sobre Pensión por Edad y Años de Servicio al establecer que: “[s]e preservan los derechos de aquellos participantes en servicio activo que al 31 de julio de 2014, contaban con los requisitos indicados en este Artículo. Se dispone que hasta el 31 de julio de 2014 los participantes acumularán los años de servicio y el Salario Promedio aplicable hasta dicha fecha”. Ley Núm. 160, pág. 42. Acto seguido, el Artículo 4.4 establece que cada participante —que pudo haberse re-tirado para el 31 de julio de 2014 pero optó por quedarse en el magisterio— retendrá la pensión a la que tiene derecho al amparo de la Ley Núm. 91, además de la pensión que acumule a partir del 1 de agosto de 2014 según dispone el Capítulo 5 de la Ley Núm. 160. Por consiguiente, no hay espacio para argumentar que la Ley Núm. 160 incentiva a estos participantes a retirarse este verano para que sus derechos adquiridos al amparo de la Ley Núm. 91 no se vean afectados inconstitucionalmente.
En cuanto al resto de los participantes que no cualifican para retirarse para el próximo verano al amparo de la ley anterior o del “Grandfather Provision”, es un sinsentido argumentar que se retirarán repentinamente en masa, pues no han cumplido los requisitos para ello. De hecho, estos participantes tendrían dos opciones: (1) renunciar al magisterio sujeto a los requisitos estatuidos en la Ley Núm. 160 para retirar sus aportaciones al Sistema de Re-tiro para Maestros;(2) o (2) quedarse en el magisterio, en *960 cuyo caso aplicaría la pensión mínima estatuida en el Artículo 3.11 de la Ley Núm. 160.(3) Según el inciso (c) de este artículo, el Sistema de Retiro para Maestros solicitará un estudio actuarial cada cuatro años para evaluar el au-mento de dicha pensión mínima. Si el estudio favorece que esta se aumente, dicho aumento sería obligatorio para la Junta de Síndicos del Sistema.
Por otro lado, el informe actuarial de 2012 preparado por Milliman retrató la salud fiscal del SRM al amparo de la Ley Núm. 91, derogada por la Ley Núm. 160. Aquellos maestros que decidan retirarse al amparo de la ventana que provee la Ley Núm. 160 se retiran en las mismas con-diciones y bajo los mismos beneficios de aquellos que se retiraron conforme a los beneficios que analizó este informe actuarial. Art. 4.4 de la Ley Núm. 160. Además, du-rante las vistas públicas del proyecto que en su día se convertiría en la Ley Núm. 160, la Asociación, otros representantes del gremio magisterial y el propio SRM expresaron inquietud ante la posibilidad de que la Ley Núm. *961 160 propiciara un retiro masivo y su posible impacto sobre las finanzas del SRM. Informe Positivo de la Cámara de Representantes de 21 de diciembre de 2013. Consecuente-mente, y en vista de la deferencia que merece el legislador, no tenemos por qué presumir que éste no consideró el re-tiro de los participantes al aprobar la Ley Núm. 160. Re-sulta diáfano que la Asamblea Legislativa estaba cons-ciente de las preocupaciones expresadas sobre la ventana de retiro, contaba con información relevante al respecto y ejerció sus prerrogativas legislativas según corresponde en un sistema republicano de gobierno.
Al conceder una ventana de retiro, la Asamblea Legisla-tiva tomó una decisión de política pública para conceder un beneficio a aquellos maestros que más se verían afectados por los menoscabos legislados en la Ley Núm. 160. En vista de ello, asumió mayor responsabilidad por la salud fiscal del SRM: aumentó su contribución patronal a un 20.53%, estableció una Aportación Uniforme para la Justicia Magisterial, comenzando en $30 millones y ascendiendo hasta $60 millones; estableció una Aportación Adicional Anual, donde aportará la cantidad necesaria para evitar que los activos brutos proyectados del Sistema nunca sea menos de $300 millones; y estableció una aportación adicional del Fondo General de $1,675 por cada pensionado, indepen-dientemente de cuándo se haya retirado. Art. 4.9 de la Ley Núm. 160, supra, pág. 49. Como señaló en su declaración jurada la Secretaria de Hacienda, Hon. Melba Acosta Febo:
Debemos notar, que, aun con los cambios al sistema propues-tos por la Ley 160-2013, se va a requerir una aportación adi-cional del Fondo General que comenzará en $30 millones y luego aumentará a $60 millones anuales. Esto quiere decir que, aun con todos los cambios, el Fondo General tiene que aportar más fondos para este sistema, para resolver el déficit. Sin embargo, no estamos hablando de los $562 millones que serían necesarios si no hacemos nada y que el Fondo General no puede asumir, en cuyo caso se acabarían los activos. Decla-ración Jurada de Melba Acosta Febo, supra, pág. 12.
*962 Tras evaluar la credibilidad de estos informes pericia-les, resulta manifiestamente especulativo intentar calcular cuántos maestros se retirarán a consecuencia de las dispo-siciones de esta ley. Igual de especulativo resulta impartir mayor credibilidad a estas opiniones periciales que a la prueba presentada por la Asamblea Legislativa y los testi-monios de funcionarios económicos del Estado, particular-mente de la propia Secretaria de Hacienda.
En otras ocasiones, los miembros de este Tribunal que hoy suscriben el análisis desacertado de la Opinión mayo-ritaria han reconocido el peligro de ignorar la deferencia que le debemos a la Asamblea Legislativa en cuanto a sus decisiones sobre asuntos de política pública en legislación socioeconómica. A modo de ejemplo, en Trinidad Hernán-dez et al. este Tribunal expresó lo siguiente:
En fin, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público, se sostendrá su validez. Al respecto, en Domínguez Castro [...] establecimos que debemos dar deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida. (Citas omitidas). Trinidad Hernández et al., supra, pág. 835.
De igual forma, algunos de los Jueces que estuvieron conformes con la Opinión mayoritaria en Domínguez Castro, estuvieron de acuerdo con las expresiones siguientes:
Sin embargo, esto no significa que el foro judicial no deba dar alguna deferencia a la determinación de necesidad y razona-bilidad que hizo el legislador en el ejercicio de su poder cons-titucional, especialmente cuando se trata de regulaciones socioeconómicas.
A modo ilustrativo, es meritorio referirnos a la interpreta-ción que se ha hecho en los circuitos apelativos respecto al grado de deferencia que se le debe dar a la determinación legislativa sobre la necesidad y razonabilidad de la medida. En Local Div. 589, etc. v. Comm, of Mass., supra, pág. 643, el Tribunal Federal de Apelaciones para el Primer Circuito se-ñaló lo siguiente:
“[DJetermining the ‘reasonableness and necessity’ of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social *963 legislation is at issue, some deference to the legislature’s judgment is surely called for”.
De igual modo se manifestó el Tribunal Federal de Apelaciones para el Segundo Circuito, en Buffalo Teachers Federation v. Tobe, 464 F.3d. 362, 370 (2do Cir. 2006), al enunciar lo siguiente:
“We hasten to point out that less deference does not imply no deference. ... Relatedly, we agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue to make a de novo determination whether another alternative would have constituated a better statutory solution to a given problem”.
En síntesis, al enfrentarnos a la impugnación de la legislación según la cláusula del menoscabo de obligaciones contractuales del Estado, debemos dar alguna deferencia a la deter-minación del legislador respecto a la necesidad y razonabilidad de la medida. Domínguez Castro, supra, págs. 85-86 (Opinión mayoritaria del Juez Asociado Señor Kolthoff Caraballo).
Luego, en la secuela Domínguez Castro, algunos miem-bros de esta mayoría se expresaron conformes con las ex-presiones siguientes en el voto particular del Juez Asociado Señor Rivera Pérez:
El legislador justificó en su extensa Exposición de Motivos, incluida en la Ley Núm. 7, la razonabilidad y necesidad de las medidas alternas que ha tomado la Rama Ejecutiva para aten-der con carácter de urgencia la crisis que nos afecta. Eso no son meras alegaciones. Es la política pública establecida por ley. Sólo luego de ese análisis es que resolvimos, dándole a la determinación de necesidad y razonabilidad que hizo el legis-lador, el grado de deferencia que ella merece en un estado de emergencia fiscal declarado legislativamente, en un sistema republicano de gobierno. En nuestro sistema constitucional, no es permisible que un juez celebre un juicio de novo para revisar la necesidad y sabiduría de una ley fiscal.
........
[...] Lo único que la normativa de [U.S. Trust Co. of New York, 431 U.S. 1 (1937),] exige es que el Estado demuestre la necesidad y razonabilidad de la medida, dándole deferencia a la determinación del legislador por imperativo del principio y doctrina de la separación de poderes. Esto no quiere decir que la normativa federal obligue a la celebración de una vista evi-denciaría como único mecanismo para que el Estado demues-tre la necesidad y razonabilidad de la medida. En el caso ante nos, el Estado demostró mediante los hechos y datos que sur- *964 gen de la Exposición de Motivos de la Ley Núm. 7, que las medidas impugnadas eran razonables y necesarias. Se atendió de esa forma, como cuestión de derecho, el planteamiento so-bre inconstitucionalidad del referido estatuto.
Con tal deferencia no estamos abdicando a nuestro rol constitucional. Todo lo contrario. No podemos, como pretenden los disidentes, “abdicar a nuestra función judicial” de salva-guardar el mandato constitucional de separación de poderes para convertirnos en un SUPER GOBIERNO. Nuestra Constitución nos lo prohíbe. (Enfasis omitido). Domínguez Castro et al. v. E.L.A. II, 178 DPR 375, 427-429 (2010) (Voto particular del Juez Asociado Señor Rivera Pérez, al que se unieron los Jueces Asociados Señores Martínez Torres y Kolthoff Carabalio, y la Jueza Asociada Señora Pabón Charneco).
Finalmente, en AAR, Ex parte, 187 DPR 835, 855 (2013), la mayoría de este Tribunal expresó lo siguiente en cuanto a la doctrina de separación de poderes:
[...] es incuestionable que la Doctrina de Separación de Pode-res es parte esencial del sistema de gobierno que hemos adop-tado como comunidad política. Como Tribunal de última ins-tancia, no podemos ceder a la tentación de obviar ese sagrado principio, o utilizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la sepa-ración de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3). Debemos ser conscientes que, al igual que las ra-mas hermanas, la Rama Judicial no está exenta de violaciones a los principios de separación de poderes. (Enfasis omitido).
No se puede colegir cómo la mayoría logra conciliar sus expresiones anteriores sobre la deferencia que le debemos a la Asamblea Legislativa en cuanto a determinaciones de política pública con lo que hoy decide la mayoría. Al proce-der de forma incongruente, hoy algunos miembros de este Tribunal asumen un rol de supralegislatura que no tiene cabida alguna dentro de nuestro ordenamiento jurídico y constitucional.
La Ley Núm. 3 de 4 de abril de 2013, cuya constitucionalidad sostuvimos en Trinidad Hernández et al., contenía *965 disposiciones idénticas a las que hoy una mayoría de este Tribunal utiliza de escudo para justificar su proceder. En la Ley Núm. 3 se eliminaron los beneficios adicionales a la pensión de retiro para aquellos empleados públicos que no se retiraran antes de su fecha de efectividad. Ante lo anterior, no entendemos cómo los miembros de esta mayoría distinguen una controversia de la otra.
En Trinidad Hernández et al. y Domínguez Castro, determinamos que los menoscabos contractuales legislados eran razonables y necesarios a base de la deferencia que debemos otorgar a la determinación que la Asamblea Le-gislativa tomó y evidenció mediante la exposición de motivos de las respectivas leyes. Ahora, una mayoría de este Tribunal resuelve que para merecer esa deferencia no basta lo consignado en la expresión de motivos, sino que la Asamblea Legislativa tiene el peso de probar la razonabi-lidad y necesidad del menoscabo a través de mecanismos probatorios adicionales a los disponibles en este pleito: la exposición de motivos de la ley, estudios actuariales, infor-mes de comisiones legislativas y prueba testifical presen-tada por funcionarios públicos con suficiente expertise como para liderar el quehacer económico y fiscal del pueblo.
En fin, este desmantelamiento del análisis de los argu-mentos de la mayoría demuestra que las razones para de-clarar la inconstitucionalidad de esta ley, vis a vis las ra-zones para declarar la constitucionalidad de la Ley Núm. 3, escapa la comprensión del derecho. El trámite obtuso abona a esta conclusión. En qué consiste el nuevo estándar adjudicativo aplicable a este tipo de controversia resulta ininteligible en estos momentos.
V
Por todo lo anterior, disiento. En vez, reconocería la constitucionalidad de la Ley Núm. 160 por entender que constituye un menoscabo razonable y necesario de las obli- *966 gaciones contractuales del Estado con los participantes del Sistema de Retiro de Maestros y que los demandantes no demostraron que existen alternativas menos onerosas para garantizar la solvencia del Sistema de Retiro de Maestros.

 Moción en tomo a Prueba de Parte Peticionaria Asociación de Maestros de Puerto Rico, Apéndice XXVII, Informe pericial de Jaime L. Del Valle Caballero, Apéndice: J.I. Alameda Lozada y A. González Martínez, Análisis de los fundamentos económicos asociados a la ley de reforma del Sistema de Retiro de los Maestros de Puerto Rico de 30 de enero de 2014, pág. 14, Caso Núm. CT-2014-0003, Pieza 3.

 El Art. 3.4 de la Ley Núm. 160 dispone lo siguiente:
“(a) A partir del 1ro de agosto de 2014, todo participante del Sistema que dejare de ser elegible como participante y (i) tuviese cotizado menos de cinco (5) años de servicio, o (ii) hubiese aportado menos de diez mil dólares ($10,000) tendrá derecho a que se le devuelva el importe de todas las aportaciones individuales que haya con-tribuido, más los intereses compuestos hasta que reciba el reembolso de aportaciones o hasta seis (6) meses después de la fecha de separación del servicio, lo que ocurra *960 primero. A dichas aportaciones se le deducirá cualquier deuda que tuviere el parti-cipante con el Sistema.
“(b) A partir del 1ro de agosto de 2014, aquellos participantes con cinco (5) años o más de servicio y que hubiesen aportado diez mil dólares ($10,000) o más al Sis-tema, no podrán retirar sus aportaciones individuales al separarse del servicio y serán acreedores de la pensión correspondiente cuando cumplan la edad de retiro establecida en esta Le/’.

 El Art. 3.11 de la Ley Núm. 160 dispone lo siguiente:
“(a) Todo participante activo al 31 de julio de 2014 que no era elegible a reti-rarse a esa fecha con una pensión cuyo beneficio sea igual o mayor al 65% del Salario Promedio, y posteriormente solicite el retiro al cumplir treinta (30) años de servicio y cincuenta y cinco (55) años de edad, tendrá derecho a una pensión mínima de mil seiscientos veinticinco dólares ($1,625) mensuales. Se garantizará la pensión mí-nima de mil seiscientos veinticinco dólares ($1,625) para los maestros que se inte-gren al Sistema a partir del 1 de agosto de 2014, al cumplir los requisitos de edad y años de servicio según dispuesto en el Artículo 3.9(d).
“(b) Se fija una pensión mínima de quinientos dólares ($500) mensuales para los participantes que se retiraron en o antes del 31 de julio de 2014. Todo pensionado que esté recibiendo una pensión menor de quinientos dólares ($500) mensuales reci-birá, a partir del 1ro de agosto de 2014, el aumento necesario para que su pensión sea de quinientos dólares ($500) mensuales.
“(c) Cada cuatro (4) años, el Sistema solicitará un estudio actuarial en el cual se evalúe el impacto de realizar un aumento en la pensión mínima establecida en este Artículo. En el caso de que el actuario favorezca un aumento en la pensión mínima, la Junta de Síndicos del Sistema se verá obligada a adoptarlo al comenzar elsi-guiente año fiscal”.